# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## Adams v. Ristine and Others.

March 20, 1924.

Absent, Kelly, P.

1. Appeal and Error—*Harmless Error—Evidence—Unanswered Questions.*—Plaintiffs in error objected to questions propounded to a nonexpert witness on questions of handwriting. · To the first question the witness gave no answer, and his answer to the second was equivocal, and plaintiffs in error failed to show in what way, if any, they were prejudiced by the question.

   *Held:* That if there was error, it was harmless.

2. Wills—*Handwriting—Nonexpert Witness—Cross-Examination.*—Upon a will contest, a nonexpert witness who had seen the testator take down orders in pencil in his store and had seen him write in his books at the store, also in pencil, but who had never seen him make his signature, testified that he thought that the alleged will and signature were in the handwriting of the testator. On cross-examination, this witness was asked to look at a page of an account book and say whether any part of it was in the handwriting of the testator. Over objection, witness replied that he would say that it was. Thereupon the beneficiary was put upon the stand and testified that the page was wholly in his handwriting. The handwriting of the testator and the beneficiary was very similar.

   *Held:* That as it was important to determine whether witness' knowledge of the writing of the testator was such as to enable him to distinguish it from the beneficiary's, the question on cross-examination was legitimate.

3. Handwriting—*Comparison of Handwriting.*—Whatever may be the law elsewhere, it is well settled in this State that comparisons of handwriting may be made with any writing proved or admitted to be genuine, whether already in the cause or not.

4. Handwriting—*Expert and Opinion Evidence—Cross-examination.*—The line of permissible cross-examination of the nonexpert witness is not altogether as extensive as that of the expert, but the same principle is involved, and the trial court must exercise its discretion as to how far it may be carried. Mere abstract questions or questions involving scientific knowledge, as a general rule, would not be permis-

sible, but questions involving the extent of his knowledge or observation, of his fairness, or his bias or prejudice, are permissible.

5. HANDWRITING—*Comparison of Handwriting—Testing Knowledge of Non-expert Witness.*—Where two persons write much alike, and it is claimed that one had forged the writing of the other, and the genuine writings of both are before the court, a nonexpert witness who has given his opinion that the alleged forged writing is genuine may be asked, on cross-examination, to look at one of the genuine writings and say whether it is in the handwriting of one or the other. This is not an unfair test of his knowledge and observation.

6. HANDWRITING—*Nonexperts—Enlarged Photographs—Case at Bar.*—On the contest of a will, a nonexpert witness was shown a photograph containing eight enlarged signatures and was asked if any of them was in the handwriting of the beneficiary or testator. The photograph had not been introduced in evidence and no explanation of any kind had been given it. It is said that two of the signatures were taken from the will. The enlargement showed a marked difference in the detailed appearance of the enlarged name.

   *Held:* That this was not a fair test of the knowledge of the witness of the ordinary writing of the testator, and the answer of the witness that he "did not know and could not say whose signatures they were," did not render the testimony entirely harmless, as it tended to impeach the witness' knowledge of the testator's handwriting.

7. HANDWRITING—*Nonexperts—Knowledge of Signature.*—On the contest of a will testimony of a nonexpert who did not claim to have ever seen testator write, or that he had any knowledge of his genuine signature, that the signatures to certain checks made by the beneficiary were in the same writing as the writing on the will was inadmissible, and it was error to allow him to give his opinion.

8. HANDWRITING—*Comparison of Handwriting—Standards of Comparison—Case at Bar.*—On the contest of a will one of the contestants testified that she was familiar with the handwriting of both the beneficiary and the testator and had frequently seen them write. Thereupon she was asked to look at a certain paper and also at a memorandum book, and state in whose handwriting each was. She was permitted to answer, over the objection of the proponents.

   *Held:* No error, as the questions were asked for the purpose of identifying examples of the genuine writings of the beneficiary and the testator and to use as exhibits in the case for the benefit of the jury.

9. HANDWRITING—*Comparison of Handwriting—Proof of Genuineness of Standards—Comparison.*—The genuineness of the handwriting of papers introduced in the record for purposes of comparison may be proved by any witness who knows the fact.

10. EXPERT AND OPINION EVIDENCE—*Qualification of Expert—Discretion of Court.*—Whether a witness is qualified to testify as an expert is largely a matter in the discretion of the trial court, and its rulings

allowing a witness to testify will not be disturbed unless it clearly appears that he was not qualified.

11. EXPERT AND OPINION EVIDENCE—*Handwriting—Bank Officials.*—A bank official who testified that for twenty years, in the course of his business at the bank, it was necessary for him to examine signatures as a daily incident of his business, largely for the purpose of detecting and preventing forgeries, is competent as a handwriting expert.

12. APPEAL AND ERROR—*Evidence—Waiver of Error by Introduction of Similar Evidence.*—Exception to error in the introduction of evidence is waived where similar evidence is introduced by the exceptor.

13. HANDWRITING—*Experts—Tests of Knowledge.*—Where witnesses qualified as experts and were permitted to give their opinions as such, their qualifications as experts may be tested, and their capacity to give reliable opinions measured by questions directed to that end. Thus, bankers who had testified that a will and signature were in the handwriting of testator may be questioned as to whether certain photographs of signatures were in the handwriting of the testator.

14. HANDWRITING — *Experts — Cross-Examination — Discretion of Trial Court.*—A very wide scope should be given to the cross-examination of experts on handwriting. They come into the case with no actual knowledge of the genuine handwriting, but professing, by their skill and knowledge of writings, to be able to compare a questioned writing with a genuine one, and tell whether the questioned writing is genuine or spurious. There is much room for fraud or mistake, and great temptation to form opinions favorable to the party calling the witness. Hence it is permissible to cross-examine them as to their experience and competency, as to their methods of investigation, and as to the reasons for the opinions they express; as to the peculiarties of the questioned writing and the difference, in this respect, between it and the genuine writing, as to the differences between his opinion and that of other experts who have testified in the case, and as to other subjects that will throw light upon weight to be given to his testimony. Indeed, the scope and limit of such cross-examination must be left largely to the discretion of the trial court whose ruling will be rarely disturbed.

15. WITNESSES—*Impeachment—Foundation for Impeachment Prior Inconsistent Statements.*—If it is intended to impeach a witness by a prior inconsistent statement, the foundation should be laid by first calling the attention of the witness to the alleged inconsistent statement and inquiring whether he made it.

16. WITNESSES—*Impeachment—Foundation—Testimony at a Former Trial.*— While questions to a witness were not in approved form, still if in each instance the witness was fully apprised of the fact that his testimony at a former trial would be used to contradict his present testimony, and he had abundant opportunity to explain his testimony at the former trail and any apparent inconsistencies between it and.

his present testimony, a sufficient foundation was being laid for the introduction of the testimony at the former trial.

17. HANDWRITING—*Experts—Photographs.*—On the trial of a will contest, it was assigned as error that an expert witness on handwriting of the contestants was asked to make his comparisons of the writings "not only from the original writings in evidence, but from the photographs which he had made." The witness made the photographs himself and testified to their correctness. Some of the photographs were enlarged, and he used several copies and could thus place before the jury the characteristics of the writings and the reasons for his opinions far better than he could by the use of the original papers only.

*Held:* That there was no merit in this assignment.

18. HANDWRITING—*Experts—Enlarged Photographs—Case at Bar.*—On the trial of a will contest an enlarged photograph of the word "Adams," a part of the signature of the beneficiary and of the testator, was admitted in evidence. There were eight of these signatures in the picture. The primary object of the photograph was to enable the contestants' expert witness to point out more plainly its peculiarities—the formation of the letters, the spacing, the angularity, the infirmity line or hestitation, and other peculiarities and to compare the writings of the beneficiary and the testator in those respects.

*Held:* That the photograph having been shown to be a correct picture of the word "Adams" in the genuine handwriting of one of the parties, its admission in evidence was proper, and it might be used in the cross-examination of adverse expert witnesses.

19. HANDWRITING—*Experts—Bankers.*—Bankers introduced by the proponents of a will, who testified that in their opinion the will was in the handwriting of the testator, may be called practical experts, and the relative weight to be attached to their testimony and that of the scientific experts was a question for the jury, but the contestants had the right to put before the jury evidence tending to show the limited extent of their knowledge of the handwriting, and the consequent value of their opinions.

20. HANDWRITING—*Experts—Enlarged Photographs—Case at Bar.*—On the trial of a will contest a book of photographs of writings of the beneficiary and the testator, admitted or proved to be genuine, and many of them already in the cause, was admitted in evidence. Some of the pictures were enlarged, others were of natural size. In some of the photographs a word from one writing, a sentence from another, and a part of a sentence from another are grouped together in juxtaposition and photographed. The originals of all writings of which the whole or any part were photographed were before the court and jury for inspection. The photographs were not offered as original evidence, nor as substitutes for original evidence, but for the purpose of demonstrating the reason for the opinion of contestants' expert.

*Held:* That there was no error in the admission of this book of photographs, and if it had the effect of giving prominence to the expert's testimony, it was no fault of the photographs.

21. HANDWRITING—*Comparison of Handwriting—Single Words.*—Where the object is to compare the formation of a single letter, it is immaterial whether a single word is used or a whole sentence in which the letter appears.

22. EXPERT AND OPINION EVIDENCE—*Weight and Value of Expert Testimony.*—In some cases the courts have severely criticized expert evidence in general as biased, mercenary, and almost worthless, such evidence as to handwriting having been considered as particularly untrustworthy. In other cases instructions that such evidence should be received with great caution have been approved. In still other cases expert testimony is commended and held not properly subject to deprecating remarks in the court's instructions, or else is declared to be entitled to the jury's unbiased consideration, free from the court's prejudicial remarks either in its favor or against it. The discredit so often attached to expert testimony is traceable particularly to the fact that it consists of conclusions and opinions which are often uncertain at best, and in which one may be swayed one way or the other by bias or interest, without conscious dishonesty, and that by existing practice the experts are selected and paid by one of the parties and their use as witnesses necessarily depends on their forming an opinion favorable to that side.

23. EVIDENCE—*Handwriting—Photographs—Grouping Specimens—Primary and Secondary Evidence.*—Where the original is produced, but it is desired also conveniently to compare specimens by photographic groupings, as by placing several specimens in juxtaposition on a single sheet, the photograph is admissible, not for the purpose of substituting secondary for primary evidence, but to bring together in one picture the different items of primary evidence so as to enable the court and the jury to see at one time several writings placed side by side, without having to look from one paper to another to see the likeness or dissimilitude, and to enable them to comprehend the illustrations and explanations given by the expert who testifies concerning them.

24. WILLS—*Contest of Will—Statements of Testator—Instructions—Case at Bar.*—On the contest of a will an instruction to the effect that the statements of the testator as to the intended disposition of his property did not affect the question of whether or not the will was in the handwriting of the testator, was erroneous. If the jury thought that the evidence as to the execution of the will left the question in doubt, they would probably give very serious consideration to the statements of the testator as to his intended disposition of his property.

25.  WILLS—*Contest—Instructions—Photographs and Experts.*—In a will con-
test, where the question at issue was the forgery of the testator's
signature, it was error for the trial court to refuse an instruction to
the jury that a book of photographs of signatures of the testator
and the beneficiary was only to be considered as evidence illustrating
the viewpoint of the expert witness who made it, and that it was
their duty to look to the original writings and from *them and other
evidence in the case* to find their verdict.   When the book of photo-
graphs was offered in evidence, it was with the express announce-
ment that it was ,"for the purpose of demonstrating the reasons for
the opinion which" the expert had expressed.

26.  HANDWRITING—*Expert and Opinion Evidence—Value.*—Opinion evidence
as to handwriting· is valuable when direct evidence of a reliable and
satisfactory character as to the *factum* cannot be obtained, but it is
subject to many abuses and is of a dangerous nature, especially .when
given by experts in the employment of, and paid by, parties offering·
it.   When there are numerous genuine papers from which the expert
is to form his standard for comparison with the disputed document,
he has great latitude for selection, and, in selecting samples for use·
in court, he has the opportunity of selecting those which best sub-
serve his purpose, and omitting those which militate against his
conclusions.

27.  APPEAL AND ERROR—*Reversible Error.*—Errors in the introduction of
testimony and questions propounded to witnesses which could have·
had but little effect upon the minds of the jurors are not of such
substantial nature as should result in a reversal.

28.  APPEAL AND ERROR—*Reversible Error—Error in Instructions—Case at
Bar.*—The refusal of the trial court in a will contest to give a proper
instruction upon request as to photographic evidence, where no other·
instruction in the cause presented that feature of the case, would
generally be ground for a reversal and an order for a new trial.   But
in the instant case the court was satisfied from the record that the
alleged forgery had been established.   The question involved was
not the effect of an erroneous instruction, but of apparently leaving·
the question at large with no instruction on the.subject.   And the
instant case was peculiar in that counsel was not precluded from.
arguing the question before the jury.

   *Held:*   That the refusal to give the instruction was not such error as
would require a reversal.

29.  NEW TRIALS—*Probability of Reaching a Different Result.*—New trials
ought not to be granted when there is no reasonable probability of
reaching a different result.

Error to a judgment of the Circuit Court of the city of Alexandria in a will contest.    Judgment for the contestants.    Proponent assigns error.

*Affirmed.*

The opinion states the case.

*J. K. M. Norton,* for the plaintiff in error.

*Woolls & Bryan* and *Carlin, Carlin & Hall,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

This is a contest over a will of which the following is a copy:

"Alexandria, Va., September 10, 1920.

"My Last Will.
"I give all my real estate and cash in bank to my brother, Charles M. Adams.          ·
"I request no inventory and no bond.

"L. M. ADAMS."

This paper was admitted to probate by the clerk of the circuit court in vacation, upon proof by two witnesses that it was wholly in the handwriting of the testator.    On appeal, all persons interested in the probate of said will were summoned, and a trial *de novo* was had before a jury, which found that the paper called a will was not the true last will and testament of Lewis M. Adams.

There were four brothers in the family, Ephriam Charles M., Lewis M. and Frank.    The first two mentioned are still living.    Frank died a few years before

Lewis M., leaving surviving him his widow and two daughters, who are the defendants in error. Frank had owned a small grocery store in Alexandria, which, by his will, he left to his brother, Lewis M., but it is said that it was not worth as much as he owed Lewis M. at the time. Charles M. and Lewis M. never married, and the latter had lived nearly all his life with Charles M., without any charge for board, and the most intimate and devoted relations existed between them. Charles M. frequently assisted in conducting the store and at times ran it alone. He did a large part of the bookkeeping, and made practically all of the deposits in bank, and signed the check in the name of Lewis by which the money was drawn out of the bank. He signed the name of Lewis to other papers whenever it was necessary to have the signature of Lewis. In one instance he signed and acknowledged a deed in the name of Lewis. This method of doing business was known to and approved by Lewis. At the time of the death of Frank he was living separate and apart from his wife and a suit for divorce by her was pending, but Lewis still maintained friendly relations with her. There is evidence on behalf of the defendants in error to the effect that Lewis M. was fond of Frank's children and they of him, and that he had said he intended to leave his property to Franks' son, and, after his death, he intended to leave it to the defendants in error.

It is claimed by the children of Frank, who are the defendants in error, that the whole will, including the signature, is in the handwriting of Charles M. Adams, the sole beneficiary therein, and is a forgery. They first introduced testimony to show that Lewis M. had declared his purpose to leave his property to them, but after Charles M. had introduced evidence of an inten-

tion to leave the property to him, they asked leave to have all evidence of declarations of the testator stricken out, but the court declined to do so. The contestants also introduced evidence that after the death of Lewis M. and before his burial, Charles M. had a conversation with an aunt of the contestants, which was heard, in whole or in part, by several other witnesses, in which Charles M. stated that Lewis M. left no will, and that he had sat up late with Lewis two nights before he died, urging him to make a will, but that he declined to do so unless and until he could get Judge Norton to draw it for him. The will is dated September 10, 1920, and Lewis M. died November 21, 1920.

There were two trials of the case in the circuit court, and Charles M. testified at both. He denied having made the statements attributed to him, but his testimony at the two trials is not altogether consistent. Each side offered both expert and nonexpert testimony. There was a motion to set aside the verdict as contrary to the law and the evidence, but it is conceded that there was abundant evidence to support the verdict, and that the verdict cannot be set aside unless some error was committed in the rulings on the evidence, or on the instructions.

Objection was made and exception taken to the action of the court in permitting counsel for the contestants to ask a nonexpert witness of the proponents, on cross-examination, the following questions:

"Q. I hand you this paper about the same size, and I ask you in your opinion whose handwriting that is? (Handing witness document.)"

"Q. I just want to ask this question. The paper which I hand you—of course, if your Honor does not think this is proper—marked 'H. G. Exhibit 2,' would you say that is in the same handwriting as the handwriting on the will, in your opinion?"

Immediately after the last question, counsel for the contestants asked and the witness answered as follows:

"Q.   Let me give you the will for the purpose of comparison (handing witness will).

"A.   It is not as well written as the will. It is somewhat different."

[1] No answer was given to the first question, and the answer of the second was equivocal. The plaintiffs in error have failed to show in what way, if any, they were prejudiced by the question. If there was error it was harmless.

[2] The proponents of the will offered to prove that the will was wholly in the handwriting of the testator by a nonexpert witness who had seen the testator take down orders in pencil in his store and had seen him write in his books at the store, also in pencil, but who had never seen him make his signature. When asked to give his opinion "as to whose handwriting that paper is, both paper itself and the signature," he replied, "I would take it to be L. M. Adams."

On cross-examination, the witness was shown a book of accounts of Lewis M. Adams, and was asked to look at page 262 and say whether that page, or any part of it, was in the handwriting of Lewis M. Adams. Objection was made on the ground that a nonexpert witness could not be asked such a question, but the objection was overruled, and the witness answered, "basing my opinion on the bills that I got from Mr. Adams, I would say it was." Thereupon, Charles M. Adams, the beneficiary in the will, was put upon the stand by the contestants and testified that page 262 was wholly in his handwriting. The witness was recalled and was asked the following question and answered the same as indicated, over the objection of the proponents:

"Q.   Mr. Jones, you have heard Mr. Charles M.

Adams take the witness stand and state that page 262, which you were of opinion was in the handwriting of Lewis M. Adams, was in the handwriting of Charles M. Adams. Does that change your opinion as to whose handwriting is contained on the will and whose signature is on the will?

"A. I do not think it does, Mr. Smith."

The handwriting of Charles M. Adams was very similar to that of his brother, Lewis M. Adams, and all the writings introduced were the genuine writings of one or the other. As the witness had testified that the whole will, including the signature, was in the handwriting of Lewis M. Adams, it was important to determine whether his knowledge of the writing of Lewis M. was such as to enable him to distinguish it from that of Charles M. It was legitimate to ask him on cross-examination the question propounded as to the entries on page 262.

[3] Whatever may be the law elsewhere, it is well settled in this State that comparisons of handwriting may be made with any writing proved or admitted to be genuine, whether already in the cause or not. *Hanriot* v. *Sherwood*, 82 Va. 1; *Johnson* v. *Commonwealth*, 102 Va. 927; 46 S. E. 789; *Keister's* v. *Philips' Ex'r*, 124 Va. 585, 98 S. E. 674, overruling *Rowt's Adm'r* v. *Kile's Adm'r*, 1 Leigh (28 Va.) 216, and *Burress* v. *Commonwealth*, 27 Gratt. (68 Va.) 934.

[4, 5] The line of permissible cross-examination of the nonexpert witness is not altogether as extensive as that of the expert, but the same principle is involved, and the trial court must exercise its discretion as to how far it may be carried. Mere abstract questions, or questions involving scientific knowledge, as a general rule, would not be permissible, but questions involving the extent of his knowledge or observation

ness, or his bias or prejudice are permissible. Where, as here, two persons write much alike, and it is claimed that one had forged the writing of the other, and the genuine writings of both are before the court, a non-expert witness who has given his opinion that the alleged forged writing is genuine, may be asked, on cross-examination, to look at one of the genuine writings and say whether it is in the handwriting of one or the other. This is not an unfair test of his knowledge and observation, 11 R. C. L. 645-6, and cases cited.

[6] The nonexpert witness, Jones, who had testified that the will and the signature thereto were, in his opinion, in the handwriting of Lewis M. Adams, was asked certain questions and was permitted to answer the same over the objection and exception of the proponents. The questions were:

"Q. Mr. Jones, I am going to hand you a photograph containing eight pictures of the handwriting of the word 'Adams,' and I am going to ask you whether they are in the handwriting of Lewis M. Adams, as you recollect from what you saw?"

"Q. In whose handwriting are those words 'Adams' on that photograph. Are they in the handwriting of Lewis M. Adams?"

"Q. Are any of them in the handwriting of Lewis M. Adams?"

"Q. Are any of them in the handwriting of Charles M. Adams?"

"Q. Are any of them in the same handwriting as the 'Adams' in the will?"

"Q. Do you think that all of those on that paper are in the same handwriting?"

To all of these questions the witness answered that he did not know and could not say whose signatures they were. The character of the photograph mentioned is

best described by Mr. Osborn, the contestants' expert who took it. On this subject he testified as follows:

"This shows eight signatures photographed directly from the original and enlarged as they here appear, directly on the plate. There are six signatures of Charles M. Adams and the two Adams from the will. This degree of enlargement shows certain details which it is more difficult to see in the smaller size. For example, a detail that I did not call attention to is the angle that appears at the base of numerous letters in Charles M. Adam's writing. For example, we have three examples in the three lower ones, the finishing part of the small letter 'a.' The last line is 'Adams' from the will, and the fourth one from the top is the 'Adams' from the will; one Charles M. Adams and the other L. M. Adams. That shows the detail in angularity which occurs frequently in the handwriting of Charles M. Adams and which occurs throughout the will. There is a tendency towards a sharp angle at the base of the letter which is not characteristic of the handwriting of L. M. Adams and is characteristic of the handwriting of Charles M. Adams. Also the infirmitive line, or the hesitation, that I have already described which appears in numerous of these signatures. It will be seen that there are certain of them that are written with more freedom and force; better control; others that are more hesitating. The two will signatures and the handwriting on the will itself is of a hesitating quality which appears frequently in the handwriting of Charles M. Adams, and is here illustrated. It also shows these small 'd's' especially that I have called attention to in a larger form. The small 'd' with the peculiar curve in the middle part of the letter. The portion up toward the middle part of the old that appears in one of the capital letter 'A's.' That is the same

form as the beginning part of the 'd.'   You will notice that the fourth one from the bottom has that same particular curvature in the capital letter iteslf, which is occasionally characteristic of this handwriting."

It will be observed that it is not a photograph of any signature at all, but simply of the word "Adams;" that it is enlarged; that the "degree of enlargement shows certain details which it is more difficult to see in the smaller size;" that it "shows the detail in angularity which occurs frequently in the handwriting of Charles M. Adams and which occurs throughout the will." That it shows the infirmity line, or the hesitation," spoken of by the expert, and shows other features that would be of value to the expert, but unobservable by the nonexpert.   This photograph is filed with the record and it is said the numbers 4 and 8 were taken from the will.   The enlargement shows a marked difference in the detailed appearance of the enlarged name.   We are of opinion that this was an unfair and improper use of the photograph with the nonexpert witness.   It had not been introduced as evidence at that time, no explanation of any kind had been given of it, it had not been shown to be an enlargement of the word 'Adams' written by any one connected with the case, nor that the witness had ever seen an enlarged photograph of any description.   It was not a fair test of the knowledge of the witness of the ordinary writing of the testator. It is said, however, that the answer of the witness that he "did not know and could not say whose signatures they were," rendered the testimony "entirely harmless."   In this view we cannot concur.   It tended to impeach the witness as to his knowledge of the testator's handwriting, especially in view of the subsequent testimony of Mr. Osborn, and called for a character of observation that the witness was not expected to possess.

William A. Barrett was one of the witnesses upon whose testimony the will was admitted to probate before the clerk, but he was not examined by the proponents of the will on the trial in the circuit court. He was called by the contestants and stated that all he knew about the handwriting of Lewis M. Adams was his signature appearing on checks in payment of his bills. It was admitted that all the checks in question were in the handwriting of Charles M. Adams. Contestants were permitted, over the objection of the proponents, to ask the witness the following questions, and the witness was allowed to give his opinion in answer to the second question:

"Q. I hand you these checks which have been offered in evidence here, made payable to your order, supposedly signed by L. M. Adams. Were these some of the checks from which you acquired the knowledge that you thought you had of the handwriting of Lewis M. Adams?

"Q. In your opinion was the writing on the checks the same as the writing on the will?"

[7] The witness was not an expert, and did not claim to have ever seen Lewis M. write, or that he had any knowledge of his genuine signature, and his opinion could not have been of any value to the jury in arriving at a correct verdict. It being conceded or proved that the checks were in the handwriting of Charles M. Adams, the jury were as capable of comparing the signatures to the checks with the will as the witness, and it was error to allow him to give his opinion. *Virginia Car. Chem. Co. v. Knight*, 106 Va. 674, 56 S. E. 725; *Southern Ry. Co. v. Mauzy*, 98 Va. 692, 694, 37 S. E. 285; *Va. Ry. Co. v. Andrews' Adm'x*, 118 Va. 482, 488, 87 S. E. 577; 4 Wig. on Evidence (2d ed.), sec. 1924.

[8, 9] Sally J. Adams, one of the contestants, testified that she was familiar with the handwriting of both Lewis M. and Charles M. and had frequently seen them write. Thereupon she was asked to look at a certain paper and also at a memorandum book, and state in whose handwriting each was. She was permitted to answer, over the objection of the proponents. There was no error in this ruling of the trial court. The questions were asked for the purpose of identifying examples of the genuine writings of each of her uncles and to use them as exhibits in the case for the benefit of the jury. As we have seen, it was not necessary for these papers to be in the record for any other purpose than for comparison, and it was competent to prove their genuineness by any witness who knew the fact.

[10, 11] Exception was taken to certain questions asked Taylor Burke, a witness for the contestants, on the ground that he was not a handwriting expert. He was a member of a private banking house, and testified that for twenty years, in the course of his business at the bank, it was necessary for him to examine signatures as a daily incident of his business, and this was done largely for the purpose of detecting and preventing forgeries.

In *Savage* v. *Bowen,* 103 Va. 540, 49 S. E. 668, it was held that whether the witness is qualified to testify as an expert is largely a matter in the discretion of the trial court, and its rulings allowing a witness to testify will not be disturbed unless it clearly appears that he was not qualified. Furthermore, that bank officials and clerks of court of long experience in examining and comparing signatures and writings may, in the discretion of the trial court, give their opinion as to whether or not the body of the will, the signature thereto and the names of one attesting witness were written in the same ink as the name of the other attesting witness, and as to which of the two was the later writing.

[12]   The trial court committed no error in accepting
Mr. Burke as a handwriting expert and permitting him
to be examined as such.

Furthermore, the proponents of the will introduced
similar evidence on their own behalf after the foregoing
testimony of Mr. Burke had been given, and if the rul-
ing of the trial court as to Mr. Burke was error, it was
waived.   *New York Life Ins. Co.* v. *Taliaferro*, 95 Va.
522, 28 S. E. 879; *Moore Lumber Co.* v. *Walker*, 110
Va. 775, 67 S. E. 374, 19 Ann. Cas. 314; *Snarr* v. *Com-
monwealth*, 131 Va. 814, 109 S. E. 590.

The proponents offered two bankers as witnesses to
give their opinion upon the handwriting of the will and
the signature thereto.   They had experience of twenty-
five and twenty-seven years, respectively, and had ex-
perience in passing upon signatures to writings.   Each
of them testified that in his opinion the will was in the
handwriting of Lewis M. Adams.   Certain questions
were asked one or the other of them, and they were
allowed to answer them over the objection of the pro-
ponents that the witnesses were not full experts and
such questions to them were improper.   The questions
and answers were as follows:

(George E. Warfield, witness.)

"Q.   Will you look at that word 'Adams' on the
photograph and tell me whether they are in the same
handwriting or not?

"A.   I could not say.

"Q.   Turning to exhibit No. 12 in the album, I will
ask you to look at the three writings containing the
'Va.' and part of the word 'Alex' and tell you that the
top one is a photograph from the will and the second
one is a photograph from the writing of Charles and
the third is a photograph from the writing of Lewis.
Which do you think looks more like the top photo-
graph?

"A.    I don't know what I think about it.    I haven't anything to do with it.

"Q.    In your opinion which of the two bottom pictures looks more like the top—the second or the third one?

"A.    The third one looks more like the top."

(Carroll Pierce, witness.)

"Q.    I want to know which writing most resembles the writing on the will, the one marked S. J. A. Exhibit 6, written by Lewis, or the one marked S. J. A. Exhibit No. 1, which you hold in your hand right now?

"The Witness:    I cannot answer the question, because there is such a difference in the time when these things were written.    That was written in 1900, before I ever saw Mr. Adams' handwriting at all, and this was written eighteen years later (showing).

"Q.    I hand you a photograph of the writing of the word 'Adams' and ask you if you can say, comparing that with the will, whether in your opinion those are the signatures of Louis Adams, or any of them?

"A.    I cannot express an opinion on that.    I am no expert in handwriting.

"Q.    I hand you another photograph and ask you if you can tell which in there are genuine signatures of Louis Adams and which are not?

"A.    I cannot express an opinion on that.

"Q.    Would you say that any of them were the genuine signatures of Louis Adams?

"A.    I would not undertake to say.

"Q.    Would you say that they are not the genuine signatures of Louis M. Adams?

"A.    Mr. Smith, I am not an expert on handwriting.

"Q.    When I tell you that two of these signatures are the same as the word 'Adams' in the will, would that change your opinion in any way?

"A.   No, sir."

[13, 14] We are of the opinion that the trial court committed no error in permitting the questions to be asked and answered.   The witnesses qualified as experts and were permitted to give their opinions as such, and the contestants had the right to test their qualifications as experts, and to measure their capacity to give reliable opinions, and the questions propounded were directed to that end.   A very wide scope should be given to the cross-examination of experts on handwriting.   They come into the case with no actual knowledge of the genuine handwriting, but professing, by their skill and knowledge of writings, to be able to compare a questioned writing with a genuine one, and tell whether the questioned writing is genuine or spurious.   There is much room for fraud or mistake, and great temptation to form opinions favorable to the party calling the witness.   Hence it is permissible to cross-examine them as to their experince and competency, as to their methods of investiagtion, and to the reasons for the opinions they express; as to the peculiarities of the questioned writing and the difference, in this respect, between it and the genuine writing, as to the differences between his opinion and that of other experts who have testified in the case, and other subjects that will throw light upon weight to be given to his testimony.   Indeed, the scope and limit of such cross-examination must be left largely to the discretion of the trial court whose ruling will be rarely disturbed.

In *Browning* v. *Gosnell* (1894), 91 Iowa, 448, 59 N. W. 340, there was given to an expert in handwriting several signatures, some of which were genuine and some written by other persons, and the witness was asked to point out the genuine signatures in order to test his knowledge, and this was permitted.   The court said:

' 'We think it is proper when a witness testifies to the genuineness of the handwriting or signature to test the value of his evidence thoroughly, and for that purpose he may be asked to give his opinion as to the genuineness of signatures which are prepared for that purpose, and in the handwriting of any person. Opinions as to the genuineness of any writing are, at best, weak and unsatisfactory evidence, and every reasonable opportunity should be afforded on cross-examination to test the value of the opinion of the witness, and we know of no better way than was resorted to in this case.''

In *Hoag* v. *Wright*, 174 N. Y. 36, 66 N. E. 579, 63. L. R. A. 163, spurious signatures were shown to the witness, along with the genuine, in order to test the skill and capacity of the witness. It was there said: "It tended to cast doubt upon the credibility of the witness and his skill as an expert. It suggested the question whether, if the witness was at fault as to the spurious signatures, he was not at fault as to the signatures in question. It made a direct attack upon the value of his opinion.  *  *.  *  Owing to the dangerous nature of expert evidence, and the necessity of testing it in the most thorough manner in order to prevent injustice, we are disposed to go farther, and to hold that, where a witness makes a mistake in his effort to distinguish spurious from genuine signatures, and he does not acknowledge his error, it may be shown by other testimony. The test sought to be applied in this case was one of the most practical and conclusive that can be employed to determine whether the witness is really an expert or not. It bears not only upon his competency to express an opinion, but upon the value of his opinion when expressed.  *  *  *  The good sense of the trial judge will confine it within proper bounds, and prevent an unnecessary consumption of time. It is better to

take a little time to see whether the opinion of the witness is worth anything, rather than to hazard life, liberty, or property upon an opinion that is worth nothing. The evils and injustice arising from the use and abuse of opinion evidence in relation to handwriting are so grave that we feel compelled to depart from our own precedents to some extent, and to establish further safeguards for the protection of the public. As the hostility of witnesses to a party may be shown as an independent fact, although it protracts the trial by introducing a new issue, so, as we think the incompetency of a professed expert may be shown in the same way and for the same reason; that is, because it demonstrates that testimony, otherwise persuasive, cannot be relied upon."

It is well settled that if it is intended to impeach a witness by a prior inconsistent statement, the foundation should be laid by first calling the attention of the witness to the alleged inconsistent statement and enquiring whether he made it. *Gordon* v. *Funkhouser*, 100 Va. 677, 42 S. E. 677. It is claimed by the proponents that this rule was violated in the instant case. We cannot go into the details, but it sufficiently appears that the questions and answers given on a former trial were in nearly every instance read to the witness, and he was asked whether or not he had so testified. In one instance the question assumed this form: "Q. At the last trial you said you talked with him two days before he died about making a will. At this trial you say that is not so. Which is correct?" While this question was not in approved form, still in each instance the witness was fully apprised of the fact that his testimony at the former trial would be used to contradict his present testimony, and he had abundant opportunity to explain his testimony at the former trial and any

apparent inconsistency between it and his present testimony, and this was all the law requires. No unfair advantage was taken of the witness.

[17] It is assigned as error that the expert witness on handwriting of the contestants was asked to make his comparisons of the writings "not only from the original writings in evidence, but from the photographs which he had made." The witness made the photographs himself and testified to their correctness. Some of the photographs were enlarged and he used several copies and could thus place before the jury the characteristics of the writings and the reasons for his opinions far better than he could by the use of the original papers only. There was no error in the ruling of the trial court in this respect.

The ruling of the trial court which has met with the most earnest opposition of counsel for the proponents is that admitting in evidence exhibits "A. S. O. No. 2" and "A. S. O. No. 1."

[18, 19] "A. S. O. No. 2" is an enlarged photograph of the word "Adams," a part of the signature. There are eight of them in the picture. We have hereinbefore stated the objection to the use of this photograph with nonexpert witnesses on cross-examination. The primary object of the photograph was to enable the contestants' expert witness to point out more plainly its peculiarities. The formation of the letters, the spacing, the angularity, the infirmity line or hesitation, and other peculiarities, and to compare the writings of Charles M. Adams with those of Lewis M. Adams, in these respects. The photograph having been shown to be a correct picture of the word "Adams" in the genuine handwriting of one of the parties, its admission in evidence was proper. *Johnson* v. *Commonwealth, supra.* The right to cross-examine adverse expert witnesses to

ascertain the extent and accuracy of their knowledge as experts was legitimate on the principles already discussed. See also *Hoag* v. *Wright, supra.* The chief objection was to the cross-examination of bank officers who were said to be only *quasi* experts, and not expected to be observant of such peculiarities as they were asked about. But they were introduced as experts by the proponents of the will, and, with no previous knowledge of the handwriting of Lewis M. Adams, were asked, upon a comparison of the genuine signature of Lewis M. with his name signed to the will, to give an opinion as to whether or not the signature to the will was the genuine signature of Lewis M. Adams. Under such circumstances, the contestants had the right to test the value and accuracy of that opinion, and the mode adopted was legitimate. The answer that they could not tell in whose handwriting the word "Adams" was simply demonstrated the limit of their knowledge on the subject. They were what may be called practical experts, and the relative weight to be attached to their testimony and that of the scientific experts was a question for the jury, but the contestants had the right to put before the jury evidence tending to show the limited extent of their knowledge of the handwriting, and the consequent value of their opinions.

[20] Exhibit "A. S. O. No. 1" consisted of a book of photographs of writings of Charles M. Adams and Lewis M. Adams, admitted or proved to be genuine, and many of them already in the cause. It contains twelve or fifteen pages. Some of the pictures are enlarged, others are of natural size. Some of the originals were written with pen and ink, others with a pencil. In some of the photographs a word from one writing, a sentence from another, and a part of a sentence from another are grouped together in juxtaposition and pho-

tographed. The originals of all writings of which the whole or any part were photographed were before the court and jury for inspection. The photographs were shown to be correct copies of the originals, and no question is raised as to this. The photographs were not offered as original evidence, nor as substitutes for original evidence, but "for the purpose of demonstrating the reason for the opinion which Mr. Osborn had expressed." Mr. Osborn was a scientific expert on handwriting introduced by the contestants. The objection to the book of photographs was not because of any use of it on the cross-examination of proponents' witnesses, but because of the grouping and the character of the grouping, and to the use of it by Mr. Osborn, who made it, because of the undue prominence thus given to his testimony, and the tendency "to minimize other testimony and other writings in the case," and because of undue surprise.

The first page of the book consists of three sheets about the size of a sheet of letter paper, and they are placed edge to edge on the side, and fastened at the sides, so as to display all three sheets equally well at the same time. The center sheet is a photograph of the will, the sheet on the right is the photograph of certain writings admittedly in the handwriting of Charles M. Adams, and the sheet on the left is a photograph of a ledger account of Lewis M. Adams in his handwriting, containing several of his genuine signatures. These are in pencil. On the same page there is a writing in pen and ink in the handwriting of Lewis M. Adams. All three pages are photographed in natural size. As indicated, the picture on the right is the genuine handwriting of Charles M., that on the left the genuine handwriting of Lewis M., and that in the middle is of the disputed will. Other pictures are made for a different purpose. For example, to show the peculiar

formation of the letter "r," or of the letter "g," or the capital "M." Again, the object was to show the infirmitive line, or the "hesitation" as peculiar to the handwriting of only one of the parties, or the tendency to print or separate the letters of a word, as done by one and not by the other. The angularity of the writings or particular letters, especially of capitals beginning sentences, was a matter of importance to be shown if there was a difference in this respect between the writings of the parties. These were differences mentioned by the witness Osborn and which he sought to point out and emphasize by the use of photographs.

It seems to be conceded that the jurors, with the originals before them, could have made these groupings and comparisons for themselves, and if need be might have used a microscope for that purpose, but this could only be done by one juror at a time, and by looking at one paper and then at another and by carrying the mental impression from one to the other. This was well nigh impossible. To compare several writings with each other to determine the identity or dissimilarity of their author they must be placed side by side so that all can be seen at once. This can be best done by a photograph in which the eye can take in the whole group at one time.

In the instant case there were a number of these photographs used, so that the jurors could have the picture before them while the expert pointed out the peculiarities and explained the reasons for the opinions which he expressed. This had a marked advantage, in a search for the truth, over a frequent reference to different papers and a comparison of them with the disputed will. These photographs were shown to be correct representations of the originals, and the object of their introduction was not to substitute them for the

originals, but to bring the originals into juxtaposition
so that they might be seen, inspected and compared at
the same time with a single mental effort, which was
impossible with the originals.    One of the originals was
a merchant's book of accounts containing many pages,
some written by Lewis M., some by Charles M., and
others containing the writing of both.    The other writ-
ings were numerous.    Moreover, the issue involved not
merely a comparison of signatures but of the general
handwriting, of the formation of certain letters, of their
angularity and other questions that could be best vis-
ualized by placing them in juxtaposition and photo-
graphing them, thus giving an "instantaneous percep-
tion" of the peculiarities of the writings so grouped.  If
this grouping, and the testimony of the expert in con-
nection therewith, whereby he pointed out the pecu-
liarities of the different writings as a reason for his
opinion, had the effect of giving prominence to his testi-
mony and tended to "minimize other testimony and
other writings in the case," it was no fault of the photo-
graphs.    The photographs were an aid to the jury in
ascertaining the truth, and were properly received in
evidence.

[21] There was some criticism of the use of a part of
a sentence or a single word in some of the photographs.
Where the object is to compare the formation of a single
letter, it is immaterial whether a single word is used or
a whole sentence in which the letter appears.

It is said in the argument for the proponents that Mr.
Osborn made an unfair selection of a word in which the
letter "g" appears in a peculiar form, and that "it
is very unfair and misleading to select and photograph
one 'word' where a letter 'g' of Lewis is not exactly like
the one in the will and let the jury take it as evidence,
when there are many, very many 'g's,' of Lewis like in

the will, in the store book in evidence." If this statement is correct, the proponents had but to show the fact, and it would not only have disproved the testimony of the witness on the subject, but have tended strongly to discredit him as a witness.

[22] There has been a great difference of opinion among the courts as to the weight and value of expert testimony. This difference is well expressed in 11 R. C. L. 587, with a full citation of authority. It is there said: "In some cases the courts have severely criticized expert evidence in general as biased, mercenary, and almost worthless, such evidence as to handwriting having been considered as particularly untrustworthy. In other cases instructions that such evidence should be received with great caution have been approved. In still other cases expert testimony is commended and held not properly subject to deprecating remarks in the court's instructions, or else is declared to be entitled to the jury's unbiased consideration, free from the court's prejudicial remarks either in its favor or against it. The discredit so often attached to expert testimony is traceable particularly to the fact that it consists of conclusions and opinions which are often uncertain at best, and in which one may be swayed one way or the other by bias or interest, without conscious dishonesty, and that by our existing practice the experts are selected and paid by one of the parties and their use as witnesses necessarily depends on their forming an opinion favorable to that side."

We have no decision in this State on the admissibility of evidence of the character hereinbefore referred to, "exhibit A. S. O. No. 1," nor have we found sufficient authority elsewhere to be able to speak of the weight of authority, but for the reasons given we are of opinion that the trial court committed no error in admitting

"exhibit A. S. O. No. 1" for the purpose for which it was used, and that such use was legitimate and proper.

[23] In 2 Wigmore Evidence (2d ed.) 797, page 106, it is said: "When the original is *produced*, but it is desired also conveniently to collate specimens by photographic groupings (as by placing many specimens in juxtaposition on a single sheet) the original is not literally unavailable (*post* section 1192), in the sense of being tangibly beyond procurement. Nevertheless, there are still lacking and unproduced to instantaneous perception, the minute resemblances and differences which appear upon close juxtaposition and fade from memory in the operation of passing from one document to the others. Hence, the photographic juxtaposition does, in strict sense, *produce these otherwise unavailable minutiae* and such grouping is therefore allowable without even any deviation from technical principle."

In *Luco* v. *United States*, 23 How. 515, 16 L. Ed. 545, the facts are not fully stated in the opinion, but in the argument of counsel it is said: "To facilitate the examination by the court of this part of the case, photographic copies of the documents were prepared and put in evidence below. They are now exhibited to the court, with perfect confidence that they will entirely dispose of the case. By the employment of the beautiful art of photography, this tribunal can examine the assailed title, and contrast it with papers of undoubted genuineness, with the same certainty as if all the originals were present, and with even more convenience and satisfaction.

"As to the signatures.

"From among the archives were selected all the signatures of Pio Pico which occur on the expedientes during the month in which it is claimed this grant was made. These were photographed upon one sheet in

the order of their dates, and are now exhibited to the
court. Their corresponding archive numbers are placed
opposite to each, and it will be observed, as before
stated, that there is no blank number, showing that all
the expedientes of this date, which were ever numbered,
are still in the archives.    Upon this same sheet is photo-
graphed the signature to the grant in question.    It has
no corresponding expediente in the archives, and there
is no number left for one.    The court can now not only
read the parol testimony understandingly, but can for
itself contrast the genuine with the simulated signature.

"(Counsel then pointed out the differences in the
nature of the handwritings, the signatures and rubrics
of Governor Pico, and contended it was phsyically im-
possible that one and the same person could have made
the genuine and disputed signatures.)"

On this subject the court said, in its opinion: "We
have ourselves been able to compare these signatures
by means of photographic copies and fully concur (from
evidence *'oculis subjecta fidelibus'*) that the seal and
the signature of Pico on this instrument are forgeries;
and we are the more confirmed in this opinion by the
testimony of Pico himself found on the record."

In *State* v. *Skillman*, 76 N. J. Law, 464, 70 Atl. 83,
the court admitted photographic copies of the disputed
will and signatures thereto, and also of other signatures
of the size of the original, but the report of the case does
not show that the writings were placed in juxtaposition
and photographed on a single plate.    The opinion
refers to and disapproves *Howard* v. *Ill. Trust Co.*, 189
Ill. 568, 59 N. E. 1106, and, referring to that case,
proceeds:    "*   *  but we cannot give adherence to
the view that photographic copies of a disputed docu-
ment are inadmissible, because the original has been
admitted.    If such copies were offered as substantive

proof of the original document, they would be clearly inadmissible. But where the sole purpose is to use the photographs to illustrate and elucidate a contention which forms the gravamen of the case, such procedure seems to be as reasonable as the use of a magnifying glass would be for the same purpose."

In *State* v. *Ready*, 77 N. J. Law, 329, 72 Atl. 445, an expert was permitted to use a photograph of a signature of a testator in which the first part of "John W." in natural size was taken from one genuine signature, and the other part "Russell," enlarged two diameters, was taken from another genuine signature, for the purpose of illustrating the difference between the genuine and the spurious signature. The court said: "The first part of the name could have been introduced in one, and the second part in another photograph; but that these parts were brought together in a single photograph did not destroy the verisimilitude of the picture, so long as it was understood to be what it was, a representation of the parts of two distinct genuine signatures."

*Leland* v. *Leonard* (1921), 95 Vt. 36, 112 Atl. 198, discusses the use of photographs of writings, but not the question involved in the instant case. It is there said, however, that "all that is required to make them admissible is that it shall be made to appear that they are sufficiently accurate to be of aid to the trier in ascertaining the truth," and that "the whole question of the admissibility of photographs is one lying largely in the discretion of the trial court and its rulings thereon are not ordinarily reviewable."

Counsel for the contestants also refer to *Wenchell* v. *Stevens*, 30 Pa. Sup. Ct. 527; *Howard* v. *Russell*, 75 Tex. 174, 12 S. W. 525, and *Storey* v. *First National Bank* (Ky.), 72 S. W. 319, but our examination of them does not disclose anything very helpful to the present discussion.

Counsel for proponents rely upon *Crane* v. *Dexter*, 5 Wash. 479, 32 Pac. 223, and quote therefrom as follows: "The appellant had caused photographs of the disputed signature and of certain genuine signatures to be made on paper, so that all the signatures were close together. These the court rejected as immaterial and irrelevant. Photography has come to be a well recognized aid to judicial investigation; but there would seem to be no call for its use in such a case as the present one. The disputed *signature* was present, as were also some 500 conceded genuine ones, so that some regard for convenience of comparison could be the only object to be gained, where as in *Luco* v. *United States*, 23 How. 515, 16 L. Ed. 545, the genuine signatures to be compared are so situated that they cannot be brought into court, or cannot be taken to an appellate court, the photograph becomes an almost perfect substitute for the original, and if taken with proper care is always received."

In that case only a signature was in dispute. In the instant case the whole will is alleged to be a forgery, and the merchant's book of accounts could not be as conveniently used for comparison as a photograph of specified pages. But even if the signature alone were involved, we would not feel disposed to follow that case.

In *Haynes* v. *McDermott*, 82 N. Y. 51, 37 Am. Rep. 538, the court felt doubtful of the certainty of expert testimony and hence was unwilling to run the "hazard of errors or difference in copying." In *Taylor's Will Case*, 10 Abb. Pr. N. S. (N. Y.) 318, the doubt about the correctness of the photograph seems to have been an important consideration, but it was also said that where the original was produced there was no necessity for using the reproduction. Neither of these cases is of special value on the question under consideration.

In *Howard* v. *Illinois Trust and Savings Bank*, 189
Ill. 568, 59 N. E. 1106, it does not clearly appear for
what purpose the photographs were offered in evidence,
but apparently no such question was involved as in the
instant case.    It was there said: "The original deed was
in evidence together with the testimony of these ex-
perts; and the defendants also offered in evidence photo-
graphs, both of the same size as the deed and those in
which it was enlarged.    The photographs were objected
to and the objections were overruled.    The photo-
graphs of the same size as the deed, if they were truthful
and accurate, were mere secondary evidence of its con-
tents and appearance.    Ordinarily, merely secondary
evidence cannot be produced without proof of loss of
the original.    As the original was in evidence, the gen-
eral rule would be that its contents or appearance could
not be proved by any kind of copy," and the court re-
fused "to extend the rule against the introduction of
merely secondary evidence."    This entirely loses sight
of the purpose for which the photograph is offered.    It
is not for the purpose of substituting secondary for
primary evidence, but to bring together in one picture
the different items of primary evidence so as to enable
the court and the jury to see at one time several writ-
ings placed side by side, without having to look from
one paper to another to see the likeness or dissimilitude,
and to enable them to comprehend the illustrations and
explanations given by the expert who testifies concern-
ing them.    The same view as to the use of secondary
evidence seems to have been applied in *McLean* v.
*Scripps*, 52 Mich. 214, 17 N. W. 815, 18 N. W. 209.

[24] At the request of the contestants, and over the
objection of the proponents, the court gave the follow-
ing instruction:

"The court instructs the jury that statements of

Lewis M. Adams as to how he intended to dispose of his property at his death go only to the question of the probability or improbability of his making the disposition of his property set forth in the alleged will, and does not affect the question of whether said alleged will is in the genuine handwriting of Lewis M. Adams or not.''

It is said by counsel for contestants that ''this instruction was intended to tell the jury that if they believed that the alleged will was *not* in the genuine handwriting of Lewis M. Adams, any statements made by him before his death, as to how he intended to dispose of his property, would not be sufficient to justify a verdict in favor of the proponent of the alleged will.'' But the instruction does not express that intention. It says that the statements of the testator as to the intended disposition of his property do not affect the question of whether or not the will was in the handwriting of Lewis M. Adams, when in fact it might have a very serious effect. If the jury thought that the evidence as to the execution of the will left the question in doubt, they would probably give very serious consideration to the statements of the testator as to his intended disposition of his property.

In *Samuel* v. *Hunter's Ex'r*, 122 Va. 636, 95 S. E. 399, it is said that ''such declarations, standing alone, are not admissible as direct evidence to prove or disprove the genuineness of the will; but in all cases where its genuineness has been assailed by other proper evidence, the declarations are admissible as circumstances either to strengthen or weaken the assault, according to their inconsistency or harmony with the existence or terms of the will'', thus showing not only the admissibility of such testimony, but its influence. The instruction was at least misleading, if not positively erroneous, and it was error to give it.

[25, 26] The refusal of the trial court to give the following instruction, tendered by the proponents, is assigned as error: "The jury are instructed that exhibit A. S. O. 1, introduced by the contestants, is to be considered by them with great circumspection. It gives the viewpoint of the witness, Osborn, and it is the duty of the jury to form their verdict from all the evidence in the case; and the exhibit above mentioned is only to be considered as evidence illustrating the viewpoint of the witness, and it is the duty of the jury to look to the original writings and from them and the other evidence in the case to find their verdict.

The instruction correctly states the law, and the refusal to give it was error.

Contestants seek to uphold its refusal on the ground that it separated and unfavorably emphasized evidence which the court had previously ruled to be proper and admissible, and was an expression by the court of its opinion on the weight to be given to this particular evidence.

In this view we cannot concur. It was a statement of the law applicable to the facts of the case which the proponents had a right to have given. It not unfrequently happens that a court is called on to state how certain classes of evidence are to be viewed; for example, the testimony of an accomplice, or of a subscribing witness to a will who testifies against the will. The original papers were all before the jury and the book of photographs was offered, not as original evidence, nor as a substitute for original evidence that could not be produced, but to enable the witness to point out more clearly the characteristics of the writing under examination, and the reasons for the conclusions reached by him. Mr. Osborn made a very clear and succinct statement of his views and his conclusions, but no statement

he could have made would have made the impression created by the pictorial presentation of his criticisms and conclusions.

Opinion evidence as to handwriting is valuable when direct evidence of a reliable and satisfactory character as to the *factum* cannot be obtained, but it is subject to many abuses and is of a dangerous nature, especially when given by experts in the employment of, and paid by, parties offering it. When there are numerous genuine papers from which the expert is to form his standard for comparison with the disputed document, he has great latitude for selection, and, in selecting samples for use in court, he has the opportunity of selecting those which best subserve his purpose, and omitting those which militate against his conclusions. While frequently of great value, such testimony is subject to this inherent weakness, and it was error for the trial court to have refused the instruction to the jury that the book of photographs was only to be considered as evidence *illustrating the viewpoint* of the witness, Osborn, and that it was their duty to look to the original writings and from *them and other evidence in the case* to find their verdict. When the book of photographs was offered in evidence, it was with the express announcement that it was "for the purpose of demonstrating the reasons for the opinion which Mr. Osborn had expressed," and the instruction tendered carried out that idea.

Our remarks on this subject are not to be taken as any reflection on Mr. Osborn, who stands at the head of his profession, and whom we should regard as incapable of any intentional unfairness, but rather as laying down a general rule for the guidance of trial courts in cases in which the question may arise.

[27-29] We have pointed out several errors com-

mitted during the trial. There remains to be considered their effect on the disposition to be made of the case in this court. The nonexpert witness, Jones, displayed so little acquaintance with the handwriting of the testator, that his answers to the unfair questions propounded to him could have but little effect upon the minds of the jurors. Neither the questions asked him, nor the opinion expressed by the nonexpert witness, Barrett, nor the instruction given at the instance of the contestants, are of such substantial nature as should result in a reversal. The only other error pointed out was the refusal of the trial court to give the instruction tendered by the proponents of the will. No other instruction given presented this feature of the case, and, generally, in such case the result is a reversal and an order for a new trial. But this court is satisfied from the record that the alleged forgery has been established, and that if a new trial is awarded it will result in another verdict similar to the last unless some new and substantially different testimony is offered by the proponents. There have already been two trials of the case, the first resulting in a hung jury. It is difficult, if not impossible, to obtain a perfect trial, and we are to consider whether or not the verdict may have been brought about by a refusal to give this instruction. The question involved is not the effect of an erroneous instruction, but of apparently leaving the question at large with no instruction on the subject. Ordinarily, such refusal would amount to a silent denial of the legal proposition involved and would forbid argument in support of that view, and this, in most cases, would necessitate reversal. But the instant case is peculiar in that respect. When the book of photographs was offered in evidence, the counsel for the contestants who offered it stated: "I offer these photographs in evidence for the

purpose of demonstrating the reason for the opinion which Mr. Osborn has expressed. In the face of such announcement, counsel for the proponents was not forbidden to explain fully and argue before the jury the use to be made of the photographs as set forth in the instruction rejected. He doubtless argued before the jury, as he did before this court, the character of the offer made by counsel when the photographs were tendered, the use to be made of them, and the circumspection with which the testimony of handwriting experts should be received. Certainly, he was not cut off from such argument by the refusal to give the instruction. Under such circumstances, the refusal to give the instruction was not such error as would require a reversal. New trials ought not to be granted when there is no reasonable probability of reaching a different result.

Upon the whole case, we are of opinion to affirm the the judgment of the trial court.

*Affirmed.*