COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Moon, Judge Coleman and Senior Judge Cole
Argued by Teleconference


DEAN A. WILEMAN, JR.
                                          OPINION BY
v.          Record No. 1139-96-2    CHIEF JUDGE NORMAN K. MOON
                                          MAY 6, 1997
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HALIFAX COUNTY
William L. Wellons, Judge

Buddy A. Ward, Public Defender (Office of the
Public Defender, on brief), for appellant.

H. Elizabeth Shaffer, Assistant Attorney
General (James S. Gilmore, III, Attorney
General, on brief) for appellee.


     Dean A. Wileman, Jr., appeals his convictions of grand
larceny by false pretenses in violation of Code §§ 18.2-178 and
18.2-95 and of making and uttering a bad check in violation of
Code § 18.2-181.  Wileman contends: (1) the trial court erred in
admitting opinion testimony that the signature on a check
allegedly made and passed by Wileman and the signature on a bank
signature card were the same; (2) the evidence was insufficient
to sustain his conviction for making and uttering a bad check;
and (3) the evidence was insufficient to sustain his conviction
for grand larceny.

     We hold (1) that the trial court properly admitted opinion
testimony concerning the legitimacy of Wileman's signature, by a
bank officer with more than twenty-four years of experience whose
duties involved verification of customer signatures; (2) that the

testimony of a bank teller, who knew Wileman by sight, that Wileman presented the check, coupled with testimony that the signature on the bad check was Wileman's, was sufficient to sustain Wileman's conviction for making and uttering a bad check; and (3) that the evidence was sufficient to sustain Wileman's conviction for grand larceny by false pretenses. For these reasons, we affirm.

## Bad Check

On May 9, 1994, check #1020, drawn on the United Jersey Bank for $3,975, was deposited into the South Boston Bank account of Wileman's business, J. L. Motors. The check was received by Michelle Howerton, a teller at South Boston. Howerton testified that she was positive that the check was deposited by Wileman. South Boston's banking procedures require that tellers ask for identification for any deposit by any customer they do not recognize and that when doing so, that they indicate on the check that identification was requested and received. Howerton stated that although she did not recall the exact transaction in which Wileman presented check #1020, she was certain it was Wileman, because if she had not recognized the presenter of the check, even where the check was being deposited into the depositor's account, she would have requested identification and so indicated on the check.

Wileman's account was given immediate credit for the sum of check #1020 when the check was originally deposited. Check #1020 was returned to South Boston marked, "Acct. Not Found."

Subsequently, Wileman wrote other checks on the South Boston account for which there were insufficient funds as a result of the nonpayment of check #1020.

At trial, Lonnie Powell, Vice-President of South Boston Bank and the chief executive officer for local branches, testified that he had been a banker for twenty-four years and that his duties included identifying and authenticating signatures of bank customers. Wileman's South Boston signature card was introduced without objection and Powell compared the signature card with Wileman's signature on two of Wileman's other checks and the signature appearing on check #1020. Powell concluded that the signatures were the same on the three instruments and the signature card. Counsel for Wileman objected to Powell's testimony, arguing that Powell was not a handwriting expert and that his opinion invaded the province of the trier of fact.

### Opinion Testimony

In Virginia, a lay witness may only offer an opinion as to the authenticity of an alleged writing of a particular person where the witness has seen and is familiar with that person's writing. Adams v. Ristine, 138 Va. 273, 287, 122 S.E. 126, 130 (1924). In essence, "the lay witness who has previously seen the genuine writing of the person alleged to have written the questioned document is `comparing' the questioned document with his recollection of the genuine handwriting." 1 Charles E. Friend, The Law of Evidence in Virginia § 15-11 (4th ed. 1993).

A lay witness who is not familiar with a particular person's

handwriting cannot be provided a sample of that person's writing for purposes of familiarizing himself or herself with it, before comparing an alleged sample to a genuine sample. Such a side-by-side comparison of genuine samples and alleged samples, by a party unfamiliar with the alleged writer's handwriting, is the sole province of the expert witness. Hanriot v. Sherwood, 7 Hans. (82 Va.) 1, 10 (1884). Where a witness is neither an expert nor familiar with the writings of the person whose writings are in question, it is error for the trial court to allow the witness to offer an opinion on such a comparison, as the jury is as qualified as the witness to make the comparison. Adams, 138 Va. at 287, 122 S.E. at 130.

Whether a particular witness is qualified to testify as an expert is "largely a matter in the discretion of the trial court, and its rulings allowing a witness to testify will not be disturbed unless it clearly appears that he was not qualified." Id. at 288, 122 S.E. at 130. Here, a comparison of Wileman's signatures was made by Powell, a Vice-President at South Boston with twenty-four years of banking experience. Powell testified that he was regularly called upon to identify and authenticate his customers' signatures. Powell's work experience was sufficient to qualify him as an expert witness. See Updike v. Texas Co., 147 Va. 208, 212, 136 S.E. 591, 593 (1927); Adams, 138 Va. at 288-89, 122 S.E. at 130.

> In Adams, the Virginia Supreme Court held that,
> bank officials and clerks of court of long
> experience in examining and comparing

- 4 -

> signatures and writings may, in the discretion of the trial court, give their opinion as to whether or not the body of the will, the signature thereto and the names of one attesting witness were written in the same ink as the name of the other attesting witness, and as to which of the two was the later writing.

138 Va. at 288, 122 S.E. at 130 (citing Savage v. Bowen, 103 Va. 540, 49 S.E. 668 (1905)). Accordingly, the Court ruled that the trial court did not err in permitting a banker with twenty years of experience, who testified that his duties required him to "examine signatures as a daily incident of his business, to testify as an expert." Id.

In Updike, the Court held it was error, under its ruling in Adams, not to permit a witness with thirty years of banking experience, whose duties required him to "scrutinize handwritings" and who was then vice-president and cashier of the Lynchburg National Bank, to compare genuine and alleged signatures of the defendant and to offer an opinion on the validity of the questioned signature.

Powell's qualifications were equal to or surpassed the bankers' qualifications who were deemed qualified in the Updike and Adams cases to give an opinion on the validity of a person's signature. Accordingly, we find the trial court did not err in overruling Wileman's counsel's objection that Powell was not qualified as an expert witness on the validity of a signature.

Further, we find that the record contained sufficient circumstantial evidence to sustain a finding that the signature

card of Wileman's J. L. Motors business account was a genuine sample of Wileman's signature. While no document may be introduced into evidence without proper authentication, <u>Proctor v. Commonwealth</u>, 14 Va. App. 937, 938, 419 S.E.2d 867, 868 (1992), circumstantial evidence may establish authenticity. <u>Walters v. Littleton</u>, 223 Va. 446, 451, 290 S.E.2d 839, 842 (1982). The signature card, which was produced from a place of proper custody, was admitted without objection. Testimony established that the card produced was the signature card on file for Wileman's business account, J. L. Motors. It was undisputed that Wileman was one of two partners trading as J. L. Motors. Further, the card was introduced with bank statements for the J. L. Motors account, with checks and deposit slips corresponding to the deposits and withdrawals recorded in the statements. Evidence was also introduced that Wileman issued a number of checks on the J. L. Motors account and that he regularly made deposits and withdrawals from the account. The evidence proved that South Boston's bank records reflected no assertion by Wileman that any of the checks drawn on his account were forged or were otherwise unauthorized. A number of the checks drawn on the account bear notations in the memo section that reference expenses for auto parts, insurance, and other such expenses that may reasonably be inferred to relate to the operation of an automobile business.

Accordingly, we find the evidence sufficient to prove that the signature card was an authentic sample of Wileman's

signature.  Thus we affirm the trial court's admission of the card as a genuine sample of Wileman's signature.


### Sufficiency of Bad Check Evidence

Relying on the Virginia Supreme Court's decisions in Doyle v. Commonwealth, 212 Va. 677, 187 S.E.2d 201 (1972); Kayh v. Commonwealth, 219 Va. 424, 247 S.E.2d 696 (1978); and Edwards v. Commonwealth, 227 Va. 349, 315 S.E.2d 239 (1984), Wileman asserts that Howerton's identification of Wileman as the presenter of check #1020 was insufficient to prove that Wileman was the presenter.

In Doyle, the defendant was accused of having issued three bad checks in a department store where he made separate purchases from three different sales associates on the same day.  None of the sales associates knew the purchaser and all three requested identification from the purchaser, who presented a driver's license.  After ascertaining that the individual depicted on the driver's license was the presenter, all three sales associates made notations on the respective checks indicating that identification had been requested and received.  At trial, none of the sales associates could recall the specific transaction in which they had received the check, but all three testified that they would not have accepted the check if the person presenting the check had not been the person depicted on the photo identification.  Doyle, 212 Va. at 678, 187 S.E.2d at 202.  The Court rejected this evidence as insufficient to establish the

identity of the individual who issued the bad checks.  Id.

The Court reached the same conclusion on substantially the same facts in Kayh, where a Sear's sales associate testified that before he accepted a purchaser's check he requested identification.  He then ascertained that the presenter and person depicted on the identification were the same and copied the driver's license number onto the check.  Like the sales associates in Doyle, the sales associate testified that he could not remember the specific transaction in which the check had been presented to him, but he presumed it to have been the defendant because he would not have taken the check without having verified that the person pictured on the I.D. was the presenter.  Citing their holding in Doyle, the Kayh Court rejected this evidence as insufficient to establish the defendant as the presenter.  219 Va. at 427, 247 S.E.2d at 698.

Subsequent to the Doyle and Kayh decisions, Code § 19.2-270.3 was enacted, providing that:

> In any prosecution under Code § 18.2-181 or Code § 18.2-182 for the presentation of a bad check, draft or order, the following shall be admissible in any proceeding, hearing or trial of the case and may be deemed competent evidence with respect to the identity of the person who delivered the check, draft or order in question to the payee, cashing party or its representative:
> 1. The unpaid or dishonored check, draft or order, bearing a notation thereon of the full name, residence address, home telephone number, and either the driver's license, social security or credit account identification number of the person who delivered such check, draft or order to the payee, the cashing party or its representative, and bearing the initials of

the representative of the payee or cashing
party to whom the check, draft or order was
delivered, as evidence that such information
was transcribed on such check, draft or order
at the time of such delivery . . . .

In Edwards, the Virginia Supreme Court rejected the argument
that Code § 19.2-270.3 established a rebuttable presumption that
a given check was presented "by the person whose name, address,
telephone number, and social security or other identifying number
are noted thereon," and reiterated that Doyle and Kayh remained
dispositive.  227 Va. at 352-53, 315 S.E.2d at 240-41.

Doyle, Kayh, and Edwards presented scenarios in which the
presenter of the bad check could have stolen both the checks and
the identification or could have falsified the identification
documents.  By either means, the presenter could have
successfully concealed his true identity and implicated an
innocent party as the passer of the bad checks.  Recognizing
this, the Virginia Supreme Court found the evidence in all three
cases insufficient to establish the identity of the presenter
because doing so would require basing an inference upon an
inference.  Quoting Doyle, the Kayh Court explained that,

"To hold this evidence sufficient to
establish the identity of the defendant as
the person who presented the checks would
require us to base an inference upon an
inference.  It would first require us to
infer that the identification documents and
photographs, which are not in evidence, were
genuine and authentic.  It would then require
us to infer and assume that the defendant was
the person who presented the checks since
this person presented identification of the
defendant.  This we cannot do."

<u>Kayh</u>, 219 Va. at 427, 247 S.E.2d at 698 (citations omitted).

The case before us is distinguishable because no such double inference is required. Unlike <u>Doyle</u>, <u>Kayh</u>, and <u>Edwards</u>, where the sales persons relied upon identification documents to establish the presenter's identity, here, the person accepting the check knew the presenter. Consequently, there is no possibility that the presenter's identity was concealed or falsified. Howerton testified that she knew Wileman by sight and that based on her personal recognition of him, she would accept his deposits without requiring identification. Accordingly, because the proscribed double inference is not at issue, we hold Howerton's testimony was admissible to prove that Wileman was the presenter of check #1020.

Howerton's testimony, coupled with Powell's opinion that the signatures on check #1020 and on the signature card were the same, is sufficient evidence, when viewed in the light most favorable to the Commonwealth, to support the trial court's finding that Wileman was the person who presented the fraudulent check to South Boston. Accordingly, we affirm Wileman's conviction of making and uttering a bad check.

<u>Grand Larceny</u>

On February 9, 1994, Wileman and his business partner purchased nine cars, including a 1988 Pontiac LeMans, at an auction conducted by Capital Auto. Capitol Auto gave Wileman seven of the nine vehicle titles and indicated that the other two titles would be forwarded to Wileman when they were received.

Wileman paid Capital Auto with a check for $9,780, drawn on Central Fidelity Bank. Wileman's check was returned from Central Fidelity to Capital Auto marked "payment stopped." Capital Auto attempted to contact Wileman but was unable to locate him. Consequently, Capital Auto did not forward the two remaining titles to Wileman.

On February 12, 1994, Byron and Angela Moore bought the 1988 Pontiac LeMans from Wileman at J. L. Motors. They paid Wileman $600 down and financed the remainder through J. L. Motors. Wileman gave the Moores a receipt and thirty-day tags, explaining that he had just purchased the car and that "the title was being sent to him along with other vehicles." When the title failed to arrive within thirty days, Wileman sent the Moores an additional set of thirty-day tags, explaining that "he was having problems getting the title."

When the Moores learned that Wileman had failed to pay Capital Auto for the LeMans, they relinquished the vehicle to the Department of Motor Vehicles. The Moores contacted Wileman and he made an appointment to meet with them and refund their money. However, when the Moores arrived for their meeting, they found a note from Wileman explaining he could not meet them because his grandmother was sick. Wileman never repaid the Moores.

> To sustain a conviction of larceny by false pretenses, the Commonwealth must prove: (a) that the accused intended to defraud; (b) that a fraud actually occurred; (c) that the accused used false pretenses to perpetrate the fraud; and (d) that the false pretenses induced the owner to part with his property.

<u>Wynne v. Commonwealth</u>, 18 Va. App. 459, 460, 445 S.E.2d 160, 161 (1994) (<u>en</u> <u>banc</u>) (citations omitted).  Here, the evidence proved that Wileman sold a 1988 Pontiac LeMans to the Moores three days after he purchased the car with a check on which payment was stopped.  It is uncontroverted that in so doing, Wileman did not have title to the LeMans and that he concealed from the Moores the fact that he had not paid for the LeMans and consequently that he was not entitled to sell the vehicle.  As a result of Wileman's representation that the title was being forwarded to him, the Moores made a $600 down payment to Wileman.  Wileman implicitly represented that he owned the LeMans and that he was lawfully entitled to the certificate of title.  The evidence proves that Wileman continued this deception by issuing a second set of thirty-day tags to the Moores and by explaining to them that he was having trouble getting title for their vehicle.  Finally, the record indicates that once his fraud was discovered, Wileman promised to refund the Moores' money but ultimately failed to do so.

The evidence that Wileman sold the Moores a car he had not paid for and for which he did not have legal title is sufficient to sustain the trial court's finding that Wileman had the requisite intent to defraud.  Likewise, the evidence that the Moores gave Wileman $600 for a car, ownership of which he could not legally transfer, is sufficient proof that fraud actually occurred.  The evidence that Wileman issued a receipt to the

Moores for the car and that he deceived them regarding the status of the car's title adequately supports the trial court's finding that Wileman's larceny was accomplished by false pretenses and that such pretenses were the means by which the Moores were induced to part with their $600.

Accordingly, we affirm Wileman's conviction for grand larceny by false pretenses.

<u>Affirmed</u>.