1997 SD 131

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Robert John LOFTUS, Defendant and Appellant.**

No. 19731.

Supreme Court of South Dakota.

Considered on Briefs Oct. 21, 1997.

Decided Dec. 3, 1997.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Robert J. Carl, Jr. Sioux Falls, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] Robert John Loftus appeals his conviction on three counts of first degree robbery, one count of commission of a felony while armed with a firearm, and two counts of second degree rape. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] On April 22, 1995, Video World I, a Rapid City, South Dakota business, was robbed at gun point. The clerk on duty at the time, K.K., testified that a man carrying a gun entered the store at approximately 10:30 p.m., just before she was going to close. She identified the robber as wearing a black sweat suit and a black ski mask. The perpetrator pointed the weapon at K.K.'s face, had her lock the doors, turn off the lights and give him all of the money except for the loose change. Next, the robber demanded to know where the safe was. After removing the money from the safe, the perpetrator took K.K. to a back room, threatened and then brutally raped her. K.K. tried to get the perpetrator to leave by telling him that someone would be by to check on her soon. K.K. was then told to get on her stomach so the robber could tie her hands behind her back with telephone cords. The perpetrator left a short time later. K.K. testified that she had heard the perpetrator's voice several times that evening when he made statements such as: "this is a robbery;" "don't be stupid;" "you're not even worth it, I might as well just kill you;" and not to do anything stupid or he would find out where she lived and hunt her down to kill her.

[¶ 3.] Another robbery occurred at a different Video World (Video World II) in Rapid City on June 7, 1995. At approximately 10:00 p.m. the clerks, J.C. and C.H., were in the process of closing the store. C.H. was outside waiting for J.C. to set the store's alarm when a person with a gun, wearing black clothes and a black ski mask approached and made her unlock the door. C.H. testified that she had some knowledge of guns and the one carried by the robber that evening looked like a 9 mm Ruger her parents owned. Once inside the store the robber demanded that the victims show him the safe. After taking the money from the safe he took the victims to a secluded area of the store and had J.C. lie on her stomach. He then used an extension cord to tie J.C.'s hands together. He then asked where the telephone cords were in order to better secure J.C. Next, he attempted to take C.H. to another area of the store. However, C.H. testified that at this point she knew that the clerk at the Video World I robbery was raped, so she started "flipping out" and refused to leave the side of J.C. Frustrated, the perpetrator eventually gave in and tied C.H. up near J.C. The robber left shortly after J.C. told him that her boyfriend would be coming soon. The perpetrator made several statements during the robbery and repeatedly threatened to "blow" the victims "away."

[¶ 4.] On June 21, 1995, the Jug Liquor Store (Jug) in Box Elder, South Dakota was robbed at approximately 10:55 p.m. The only clerk on duty at that time, V.N., testified that the robber entered the store wearing a black ski mask and carrying a black 9

mm gun. V.N. was told to take the money from the till and put it in a bag. The robber told her he wanted the cash and "just the quarters" but did not want the loose change. Next, the perpetrator removed the money from the Jug's safe. At this point he had V.N. lay down on her stomach so he could tie her hands and ankles with a telephone cord and extension cord. Thereafter, the robber put the gun to V.N.'s head and said, "now this will be the true test to see if you're gonna live or not." The perpetrator took V.N. to another room and then raped her. V.N. attempted to prompt the perpetrator to leave by telling him that her friends would be concerned if they saw her car outside so late. Before leaving, he retied her wrists to her ankles. She remained in this state until the Jug's owner arrived in the morning. At some point that evening the perpetrator used a magic marker to write "Dirty White Boys" and "TBZ"[1] on a television and the cooler doors.

[¶ 5.] A few days before the Jug robbery, a Box Elder man approached a red Hyundai with tinted windows parked near the Jug and noticed the driver lay down on the seat. He became suspicious and followed the car for some distance before losing sight of it. After the Jug robbery he heard a news story that the police were looking for information. concerning a red vehicle with tinted windows that was seen in the parking lot of a bar and supper club (supper club) northwest of Rapid City that was robbed on April 26, 1995.[2] The Box Elder man found the red car he had seen before the Jug robbery near the location he had lost sight of it just days before. He wrote down the license number and gave it to the police. The car was registered to Loftus.

[¶ 6.] On June 24, 1995 a warrant was issued for Loftus. The next day a highway patrol officer identified a car matching the description of Loftus' car and turned on his lights and siren. Loftus fled but was eventually apprehended after a high-speed chase. Police recovered currency believed to have been taken from the Jug as well as firearms matching descriptions of the weapons used in the robberies. Loftus was interviewed by the police and eventually stated that he was only the driver, but did not otherwise participate, in the Jug robbery and rape and the robbery of the supper club.

[¶ 7.] During the course of the investigation the State performed tests on vaginal/cervical swabs obtained from K.K. and V.N. in order to locate the presence of bodily fluids that were foreign to the victims. The tests were positive and later comparisons disclosed that Loftus had the same enzyme type as that found in the victim samples. Following the serological testing, the State hired an expert, James Liberty (Liberty) of Precision Genetics, to perform DNA testing. Liberty's testimony at trial essentially consisted of two components. First, Liberty concluded that the DNA pattern from the K.K. and V.N. samples matched the DNA pattern obtained from Loftus' blood sample. Liberty used a procedure known as Restricted Fragment Length Polymorphism (RFLP) to obtain the match. The second component of Liberty's testimony concerned the statistical probability that a random person could, by chance, have the same DNA pattern as that located on the samples taken from the victims. Using a standard population genetics equation known as the "product rule" or "Hardy–Weinberg equation,"[3] Liberty concluded that the possibility of a random match between V.N. and Loftus was *one in forty-six million*.

1. The record indicates that the writings are references to gangs in the Rapid City area.

2. The facts are fully explained in *State v. Loftus*, 1997 SD 94, 566 N.W.2d 825, wherein Loftus' convictions of first degree robbery, commission of a felony while armed with a firearm, attempted second degree rape, and aggravated assault were affirmed. Briefly stated, the facts indicate that Loftus entered the supper club wearing all black and a black ski mask wielding a weapon and stating, "This is a robbery." Thereafter, he took money from the cash register and instructed the female clerk to take him to the safe. He then told her to lie on her stomach and tried to tie her hands behind her back. He became frustrated and struck her in the face, causing her head to hit a cinder block wall. He attempted to rape her but left soon after she told him that some employees would be arriving soon.

3. In 1908, two scientists, G.H. Hardy and W. Weinberg, theorized that in a population at equilibrium, the frequencies of all genetic traits remain constant from generation to generation.

With regard to K.K., Liberty testified that the possibility of a random match was one in fifteen thousand.

[¶ 8.] On January 8, 1996, Loftus was arraigned on a two-part information. Part I alleged that Loftus committed the crimes at Video World I and II as well as the Jug. Part II alleged that Loftus was a habitual offender. The jury convicted Loftus on all counts in Part I of the indictment. Loftus waived a jury trial on Part II and the trial court found him to be a habitual offender based upon his convictions of attempted escape and grand theft in 1988. Loftus was sentenced to life in prison without parole on all Counts. Loftus appeals his convictions, raising the following issues:

1. Whether the trial court abused its discretion when it denied Loftus' motion for severance?

2. Whether the in-court identification of Loftus' voice by the victims of Video World I and the Jug was unreasonably suggestive and resulted in prejudice to Loftus?

3. Whether the trial court abused its discretion in admitting statistical DNA evidence?

4. Whether the trial court abused its discretion in allowing a police officer to testify about similarities between writings left at the Jug crime scene and writings contained in a notebook found on Loftus' dresser?

5. Whether Loftus was prejudiced through the State's demonstrative use of a pictorial exhibit of a 9 mm handgun?

6. Whether there was sufficient evidence upon which to convict Loftus?

## ANALYSIS AND DECISION

[¶ 9.] **1. Whether the trial court abused its discretion in denying Loftus' motion for severance of the charges.**

[¶ 10.] We review a trial court's denial of a motion to sever charges under an abuse of discretion standard. *State v. Thompson,* 1997 SD 15, ¶ 14, 560 N.W.2d 535, 538; *State v. Busack,* 532 N.W.2d 413, 417 (S.D.1995).

"An abuse of discretion arises only where the party requesting severance of joined counts can make a clear showing of prejudice to substantial rights." *Thompson,* 1997 SD 15 ¶ 14, 560 N.W.2d at 538 (citations omitted).

[¶ 11.] SDCL 23A–6–23 provides the standard for joinder of related offenses in same indictment or information:

Two or more offenses may be charged in the same indictment or information in separate counts for each offense, if the offenses charged, whether felonies or misdemeanors or both, are of the *same or similar character* or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a *common scheme or plan.*

(Emphasis added). SDCL 23A–11–2 provides the guidelines to the trial court where it appears joinder may result in prejudice to the defendant or to the State:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the prosecuting attorney to deliver to the court for inspection in camera any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.

[¶ 12.] We have held that "[w]here separately charged offenses are closely related in location and manner of execution ...." joinder may be appropriate. *Thompson,* 1997 SD at 15 ¶ 16, 560 N.W.2d at 539 (citing *Busack,* 532 N.W.2d at 417; *State v. Closs,* 366 N.W.2d 138, 140 (S.D.1985)). This test for finding joinder appropriate where the separately charged offenses are closely related in location and manner of execution has been broadly construed. *Shape,* 517 N.W.2d at 654 (citing *State v. Dixon,* 419 N.W.2d 699, 702 (S.D.1988)).

[¶ 13.] In *Thompson,* this Court found no abuse of discretion by the trial court in joining for trial three informations charging the defendant with six counts of sexual misconduct of three minor children. 1997 SD at 15 ¶ 17, 560 N.W.2d at 539. Specifically, we found joinder under the "same or similar character" test proper since the charges of sexual misconduct all involved defendant's nieces, occurred over a four-month period, and all of the crimes occurred in defendant's mobile home. *Id.* In *Closs,* this Court found that joinder may be proper where separately charged offenses are closely related in time, location, and manner of execution. 366 N.W.2d at 138. *See also Busack,* 532 N.W.2d at 417 (separate charges satisfied "same or similar character" requirement because both involved illegal possession of controlled substances, and both incidents took place at the same location).

[¶ 14.] The facts of the present case indicate that the charges stemming from the crimes committed at Video World I, Video World II, and the Jug were properly joined as they were similar in character and closely related in time, place, and manner of execution. *Closs,* 366 N.W.2d at 140. All of the charges involved crimes committed in or near Rapid City. The crimes were committed within a period of sixty-one days by a person dressed in black, wearing a black ski mask, and carrying a firearm just before the businesses were to close. In each instance the robber made repeated verbal threats, forced each of his victims to lie on their stomach so he could tie their hands together with either a telephone or extension cord. In the three crimes, money was taken from the cash registers, safes, and the purses of each victim. The victims in the Video World I and the Jug robberies were raped and the victim in Video World II thought she would be raped when the perpetrator tried to take her to a secluded area of the store. Additionally, in all cases the perpetrator left shortly after the victims told him that third parties would be checking on them soon. Under the "same or similar character" analysis we look to the similarities of the charges and find no abuse of discretion by the trial court.

[¶ 15.] **2.    Whether the in-court identification of Loftus' voice by the victims of Video World I and the Jug was unreasonably suggestive and resulted in prejudice to Loftus?**

[¶ 16.] In-court identifications are inadmissible when they are derived from an impermissibly suggestive identification lineup procedure which has a substantial likelihood of resulting in irreparable misidentification. *State v. Garza,* 1997 SD 54, ¶ 32, 563 N.W.2d 406, 412; *State v. Abdo,* 518 N.W.2d 223, 225 (S.D.1994); *State v. Iron Thunder,* 272 N.W.2d 299, 301 (S.D.1978); *State v. Sahlie,* 90 S.D. 682, 688, 245 N.W.2d 476, 479 (1976); *State v. Barcley,* 88 S.D. 584, 587, 225 N.W.2d 875, 877 (1975). The trial court will not be reversed unless an abuse of discretion is shown. *Abdo,* 518 N.W.2d at 226. We apply the two-prong test for photographic lineups from *Abdo* to the pre-trial voice identification of Loftus: "(1) Was the lineup impermissibly suggestive, and (2) if so, was the subsequent in-court identification tainted?" 518 N.W.2d at 225 (citing *Iron Thunder,* 272 N.W.2d at 301). "The burden of establishing the impermissible suggestiveness of the photographic lineup is on the party seeking to suppress the evidence." *Id.*

> The suggestiveness of the procedure is evaluated by examining the totality of the circumstances surrounding the identification procedure. Under the totality of the circumstances, if there is not a very substantial likelihood of irreparable misidentification, then the reliability of an in-court identification is for the jury to weigh.

*State v. Arguello,* 502 N.W.2d 548, 552–553 (S.D.1993) (quoting *State v. Hanson,* 456 N.W.2d 135, 138 (S.D.1990) (citations omitted)).

[¶ 17.] K.K. and V.N. attended the supper club trial where they heard Loftus testify on his behalf. Both victims recognized Loftus' voice as that of their attacker. Loftus contends that the subsequent in-court identification of his voice by victims was unreasonably suggestive and therefore prejudicial.[4] Critical to our inquiry is the partic-

---

4.   V.N. was called by the State as a witness in the    earlier supper club trial and voluntarily attended

ipation, or lack thereof, of the State in the pretrial identification process at issue. Loftus argues that the necessary State involvement is present since the victims attended the earlier trial with a representative of the Victim's Assistance Office. However, there is no evidence that any State officer arranged the pre-trial viewing for purposes of identifying Loftus' voice. To the contrary, V.N. testified that nobody from the State's Attorney's Office, the Victim's Assistance Office or any law enforcement agency encouraged her to attend the supper club trial for purposes of making a voice identification. *See United States v. Stevens*, 935 F.2d 1380, 1390 n. 11

most of the proceedings. Loftus does not claim this as a basis for finding the necessary State involvement. Loftus does not allege and the record does not clearly indicate whether V.N. testified that Loftus' voice was that of her attacker at the supper club trial.

5. If we were to agree with Loftus' contention, that his pre-trial identification was impermissibly suggestive, our inquiry would not end. We again would look to the totality of the circumstances to determine whether the identification was tainted. *See State v. Jaeb*, 442 N.W.2d 463, 465–66 (S.D. 1989) (citing *State v. Phinney*, 348 N.W.2d 466, 468 (S.D.1984)). According to Neil v. Biggers, five factors are applied to this analysis. 409 U.S. at 188, 199–200, 93 S.Ct. at 375, 382, 34 L.Ed.2d at 401, 411 (1972). These factors include:

1) LENGTH OF TIME BETWEEN CRIME AND CONFRONTATION.
Between four and six months had elapsed from the robberies and rapes to when K.K. and V.N. identified Loftus' voice at the supper club trial. We have not established a mechanical rule as to what constitutes "too long" between a crime and an identification. *See United States v. Rundell*, 858 F.2d 425, 427 (8th Cir.1988) (An eight month time frame between robbery and identification did not render identification inadmissible); *Abdo*, 518 N.W.2d at 226 (Over two months between arrest and identification and three years between arrest and in-court identification not impermissibly suggestive). The trial court considered *all* of the circumstances and felt that this length of time was not so great as to render the identification unreliable.

2) OPPORTUNITY OF THE WITNESS TO OBSERVE THE ACCUSED AT THE TIME IN QUESTION.
The robber/rapist wore a mask so his physical attributes could not be observed with great detail. The victims based their identification on their assailant's voice. The record supports the trial court's finding that there was "considerable conversation" by the perpetrator during the course of his crimes which would have

(3rd Cir.1991) ("[I]n order to establish that a pre-trial confrontation was unduly suggestive, the defendant must first show that the government's agents arranged the confrontation or took some action during the confrontation which singled out the defendant.") (citation omitted); *Reese v. Fulcomer*, 946 F.2d 247, 259 (3rd Cir.1991); *Thompson v. State of Mississippi*, 914 F.2d 736, 738 (5th Cir.1990); *United States v. Thevis*, 665 F.2d 616, 643 (5th Cir.1982).

[¶ 18.] The record before us is void of any indication of improper State motive or influence.[5] Both K.K. and V.N. voluntarily attended and observed a public trial. This

enabled the victims to have an adequate basis from which to identify Loftus.

3) LEVEL OF CERTAINTY EXHIBITED.
Upon hearing Loftus' voice, K.K. told her mother with great certainty, "that's the voice that I heard on the night that I was raped." K.K. continued to demonstrate certainty throughout the trial. Similarly, there was no question in the mind of V.N. that Loftus' voice was the voice of the person who robbed and raped her.

4) WITNESS' DEGREE OF ATTENTION.
The perpetrator made several comments during the course of each crime. Both K.K. and V.N. were tied up, threatened, and brutally raped while in fear for their lives. The trial court found that under these circumstances the victims displayed the required degree of attentiveness. The perpetrator gave the commands and the victims complied. There is no evidence in the record that either victim could not hear the voice of their attacker.

5) ACCURACY OF PRIOR DESCRIPTION.
Loftus argues that K.K.'s identification was unreliable because she had believed the voice of her attacker to be that of a white male. Loftus is of Native American and Hispanic heritage. It is important to note that even after identifying his voice from the earlier trial she continued to believe that Loftus sounded like a white male. The trial court could not find a distinctive pattern in Loftus' speech which could provide a basis for determining that he sounded of Native American or Hispanic heritage. As the United States Supreme Court explained in *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, 155 (1977):
We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Court and the United States Supreme Court have recognized that the decision about whether a pre-trial identification was impermissibly suggestive is primarily subjective. *Iron Thunder,* 272 N.W.2d at 301 (citations omitted). The trial court considered the totality of the circumstances and exercised its discretion to allow the in-court identification. We find no abuse of discretion.

[¶ 19.] **3.** **Whether the trial court abused its discretion in admitting statistical DNA evidence?**

[¶ 20.] We have consistently stated that the trial court has broad discretion concerning evidentiary rulings, is presumed correct and will not be reversed absent a clear showing of abuse of such discretion. *Bland v. Davison County,* 1997 SD 92, ¶ 57, 566 N.W.2d 452, 466; *State v. Goodroad,* 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129; *State v. Hill,* 463 N.W.2d 674, 676 (S.D.1990).

[¶ 21.] In State v. Hofer, we departed from adherence to the former *Frye*[6] rule requiring general acceptance in the scientific community and adopted the new standard set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 480 (1993). 512 N.W.2d 482, 484 (S.D.1994) (citation omitted); *State v. Schweitzer,* 533 N.W.2d 156, 159 (S.D.1995). The *Daubert* standard requires the trial court to ensure that an expert's testimony both "rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Kuper v. Lincoln–Union Elec. Co.,* 1996 SD 145, ¶ 40, 557 N.W.2d 748, 760 (citing *Hofer,* 512 N.W.2d at 484) (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485). In *Daubert,* the United States Supreme Court offered some of the factors to be considered when determining the admissibility of expert scientific testimony: (1) it has been tested; (2) it has been subjected to peer review and publication; (3) the known or potential rate of error must be known; and (4) to what extent it has received general acceptance. 509 U.S. at 592–93, 113 S.Ct. at 2796, 125 L.Ed.2d at 482–83.

[¶ 22.] The foundation of the *Daubert* rule is located in Federal Rule of Evidence 702 and was adopted in SDCL 19–15–2 which provides:

> If *scientific,* technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Emphasis added). The Supreme Court has elucidated upon the language contained in Federal Rule 702 as follows:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

*Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481.

[¶ 23.] Loftus, while conceding that Liberty possesses expert qualifications in DNA matching techniques, argues that Liberty was not qualified to give statistical probability DNA opinion because he is not a population geneticist. The trial court first became aware of Liberty's qualifications at a DNA suppression hearing held on March 13, 1996. There was ample evidence before the trial court that Liberty possessed expert qualifications in the area of DNA, which would include statistical DNA probability analysis.[7] *See State v. Edmundson,* 379

---

6. *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923) (Scientific evidence "must be sufficiently established to have gained general ac-ceptance in the particular field in which it be-longs" before it may be admitted).

7. Liberty's credentials include: (1) a Bachelor of Science Degree, with a major in microbiology;

N.W.2d 835, 839 (S.D.1985) (trial court's exercise of discretion in allowing a witness to testify as an expert will not be overturned on appeal unless "there is no evidence that the witness had the qualifications of an expert"). Furthermore, calculations determining statistical probabilities are basic to DNA analysis. *United States v. Davis*, 40 F.3d 1069 (10th Cir.1994). Therefore, we find no abuse of discretion.

■ [¶ 24.] The thrust of Loftus' DNA argument rests upon the admission of statistical DNA evidence which, he contends, is based upon an unreliable foundation. Loftus claims there is a great deal of uncertainty within the scientific community concerning the "product rule" method of obtaining statistical probabilities. Loftus' trial expert, Laurence Mueller, testified that the product rule fails to take into consideration the cross-mating of our population which then form subgroups. Thus, since Loftus is of Native American and Hispanic heritage, Liberty's statistical probability calculation step of the DNA analysis using a major population database (Caucasian, African American and American Indians) was flawed.

(2) several graduate level courses at the University of Virginia in conjunction with the FBI Academy; (3) DNA research at the University of Minnesota Medical School; and (4) employment with the Minnesota Bureau of Criminal Apprehension where he initiated and set up DNA testing protocols. Furthermore, Liberty has published several "peer reviewed" articles relating to DNA analysis. Liberty belongs to the American Association of Forensic Sciences and the Midwestern Association of Forensic Sciences and is certified by the American Board of Criminalists. Liberty has been involved in 150–200 separate cases involving DNA analysis. Concerning Liberty's qualifications to present statistical DNA evidence, Liberty testified that he has published several papers including one focusing on some of the "statistical methods available for determining whether two DNA samples match."

8. Loftus has also urged that this Court follow the holding of the Nebraska Supreme Court in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), wherein the *Frye* requirement of general scientific acceptance was retained with regard to the statistical probability calculation step of DNA analysis. *See also State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992). It is important to note that when this Court adopted the *Daubert* standard in *Hofer*, we did so unconditionally and without discrimination concerning individual scientific disciplines such as DNA evidence. *See*

[¶ 25.] Furthermore, Loftus argues that Liberty's database of between 200 and 300 individuals was too limited because it failed to take into account his individual population subgrouping (i.e., Native American and Hispanic ethnicity). The relatively scant authority cited in Loftus' brief correctly identifies the debate that was present in the scientific community concerning DNA statistical evidence in the early 1990's.[8] However, since that time an overwhelming amount of scientific commentary and legal authority exist indicating the dispute has been resolved and the "product rule method of DNA statistical evidence is now generally accepted in the relevant scientific community." [9] This calming of the product rule debate is attributable, in part, to the results obtained from the FBI's completion of an exhaustive worldwide population survey which laid to rest the idea that "population subgrouping affected DNA probability estimates to a defendant's disadvantage." *See* United States Department of Justice, Federal Bureau of Investigation, *I–A VNTR Population Data: A Worldwide Study* (1993) (FBI Study), (cited in *People v.*

*State v. Moeller*, 1996 SD 60, 548 N.W.2d 465 (applying *Daubert* standard to PCR DQ Alpha DNA typing); Department of Soc. Serv. *ex rel. Wolf v. McCarty*, 506 N.W.2d 144 (S.D.1993). While we recognize that the "product rule" is no exception to the Supreme Court's concession in *Daubert* that "there are no certainties in science" we decline to attach conditions on a science by science basis as Loftus appears to suggest. *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481. Therefore, we decline the invitation to depart from the holding of *Daubert* in the context of statistical DNA admissibility.

9. *People v. Chandler*, 211 Mich.App. 604, 536 N.W.2d 799, 803 (1995)(citing Lander & Budowle, DNA Fingerprinting Dispute Laid to Rest, Nature (October 27, 1994); *People v. Amundson*, 41 Cal.Rptr.2d 127 (Cal.Ct.App.), review granted, 43 Cal.Rptr.2d 827, 899 P.2d 896 (Cal. 1995); *Lindsey v. People*, 892 P.2d 281 (Colo.1995); *Taylor v. State*, 889 P.2d 319, 335–336 (Okla.Crim. App.1995)).

Even if we were to accept Loftus' invitation to retain Frye in this area, the Chandler court recognized that "every jurisdiction that has considered this question since the Lander & Budowle article, including those states that have Frye-type tests, has concluded that DNA statistical evidence satisfies the Frye test." 536 N.W.2d at 803.

*Dalcollo,* 282 Ill.App.3d 944, 218 Ill.Dec. 435, 445, 669 N.E.2d 378, 388 (1996)). The study concluded that the estimate of the "current practice of employing the product rule and using general population databases is reliable, valid, and meaningful, without forensically significant consequences." FBI Study, at 2; *Id.* In addition, the weight of authority in the scientific community supports the proposition that "differences due to ethnicity or substructuring have little impact on DNA population frequency estimates and that the product rule is appropriate to estimate probabilities of a random match." *People v. Amundson,* 41 Cal.Rptr.2d 127, 138 (Cal.Ct.App.), *review granted,* 43 Cal.Rptr.2d 827, 899 P.2d 896 (Cal. 1995); *Chandler,* 211 Mich.App. at 610–611, 536 N.W.2d 799; *People v. Marlow,* 41 Cal.Rptr.2d 5, 33 (1995) (citations omitted); *State v. Brown,* 470 N.W.2d 30 (Iowa 1991); *Armstead v. State,* 342 Md. 38, 673 A.2d 221, 240 (1996) (citations omitted).

[¶ 26.] After an extensive review of the record, relevant case law and scientific literature, we agree that the product rule method of analyzing DNA statistical evidence rests upon a reliable foundation. Upon completion of an extensive direct and cross-examination of Liberty at the pre-trial DNA suppression hearing, the trial court was satisfied that the DNA procedures utilized by Precision Genetics rested on a reliable foundation and would assist the trier of fact. *See Kuper,* 1996 SD 145 ¶ 41, 557 N.W.2d at 760 (When the trial court is ruling on the admissibility of purported expert opinion, the trial court "needs to exercise its gatekeeping function.") The record is clear that the trial court fulfilled its "gatekeeper" duties prior to admission of the Precision Genetic DNA evidence. Therefore, any evidentiary attack at trial is relevant to its weight and not its admissibility. *See Davis,* 40 F.3d at 1074; *United States v. Bonds,* 12 F.3d 540, 564–565 (6th Cir.1993); *Marlow,* 41 Cal.Rptr.2d at 32; *Chandler,* 536 N.W.2d at 802; *Brown,* 470 N.W.2d at 32; *State v. Morel,* 676 A.2d 1347, 1355 (R.I. 1996). In making this ruling, we note that the benefit of the product rule method of statistical probability analysis evidence applies equally to the defense as well as the prosecution. Because such results may indicate the likelihood that a defendant was not the perpetrator of a crime, statistical DNA evidence may provide a source of exculpatory evidence. *State v. Moeller,* 1996 SD 60, ¶ 69, 548 N.W.2d 465, 483.

[¶ 27.] We have thoroughly considered Loftus' additional claims and find them to be without merit.

[¶ 28.] Affirmed.

[¶ 29.] MILLER, C.J., and AMUNDSON, J., concur.

[¶ 30.] SABERS and KONENKAMP, JJ., concur in result.

KONENKAMP, Justice (concurring in result).

[¶ 31.] The majority declined to undertake this question, but I believe it is of sufficient importance to merit discussion and concern. Loftus maintains the trial court abused its discretion when it allowed Detective Kerdell Remboldt of the Rapid City Police Department to testify about his opinion upon comparing two writings when the origin of each was disputed. The only purpose for this testimony was to prove Loftus was the perpetrator of the offense at the Jug Liquor store. Detective Remboldt compared writings in a notebook discovered during the search of Loftus' residence and writings found on a cooler door at the liquor store.

[¶ 32.] He may be an expert in certain endeavors, but Detective Remboldt conceded on cross-examination he is not credentialed as a handwriting analyst. Under SDCL 19-17-1 (Rule 901), adopted from the Federal Rules of Evidence, the testimony of a nonexpert related to a particular handwriting sample is sufficient for purposes of authentication *only* if it is based on a *familiarity with such writing* not acquired for purposes of litigation. Moreover, only when a lay witness establishes a familiarity with another's handwriting and describes the relationship or circumstance from which that knowledge might have been acquired may the testimony be admitted. *United States v. Tipton,* 964 F.2d 650, 655 (7th Cir.1992); *United States v. Standing Soldier,* 538 F.2d 196, 202 (8th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct.

646, 50 L.Ed.2d 627 (1976); *Wileman v. Commonwealth*, 24 Va.App. 642, 484 S.E.2d 621, 623 (1997)("[A] lay witness may only offer an opinion as to the authenticity of an alleged writing ... where the witness has seen and is familiar with that person's writing."); M. Graham, *Handbook of Federal Evidence*, § 901.2, at 694 (4th ed 1996). Nothing in the record intimates Remboldt ever had occasion to gain familiarity with Loftus' handwriting other than in preparation for this case. As such, the trial court abused its discretion in allowing Remboldt to impart to the jury his amateur comparison of the two writings. *State v. Harris*, 839 S.W.2d 54, 70 (Tenn.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993) (the trial court did not abuse its discretion in disallowing a lay witness to give her opinion on the comparison of two writings when the witness was not familiar with the handwriting of the defendant); *Wileman*, 484 S.E.2d at 624 ("Such a side-by-side comparison ... by a party unfamiliar with the alleged writer's handwriting is the sole province of [an] expert witness."); *see also* 5 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 901.04(1)(2d ed 1997)(" ... [N]on-expert handwriting evidence is not admissible if the proponent has not shown even a minimal factual basis from which knowledge of, and a familiarity with, another's handwriting might reasonably have been acquired.").

[¶ 33.] Moreover, Detective Remboldt compared two writings of unknown origin. Though the notebook was found in the defendant's bedroom, it must be observed that the defendant shared this bedroom with his wife, Natalie. In fact, Natalie testified under oath that the notebook was hers. There were captions and intimate passages in the notebook indicating it was Natalie's, thus corroborating her testimony. If there is doubt about the source of a writing, even the most precise comparison will be nothing more than immaterial and irrelevant. 5 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* at § 901.05(2)(a).

[¶ 34.] A writing sample may be authenticated and identified by comparing it with a specimen of known origin already in evidence or admitted by the court as genuine. *Id.* at

§ 901.05(1). Yet even if one of the writings in this case was unequivocally established as the defendant's, such a comparison can only be made by a handwriting expert or the trier of fact, if the similarities are obvious. *Id.* at § 901.05(1); M. Graham, *Handbook of Federal Evidence*, § 901.2, at 696.

[¶ 35.] Where a witness is neither a handwriting expert nor familiar with the writings of the person whose writing is in question, it is error for the trial court to allow the witness to offer an opinion on such comparison. *Adams v. Ristine*, 138 Va. 273, 122 S.E. 126, 130 (1924). What saves this from being prejudicial error, was the other circumstantial evidence in this case along with Remboldt's candid admission before the jury that his analysis was not very beneficial because he lacked the expertise to furnish the very opinion he rendered.

[¶ 36.] I concur with the remainder of the majority opinion.

[¶ 37.] SABERS, J., joins this writing and I am authorized to so state.