#28679, #28680-a-DG
**2019 S.D. 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

    v.

ROBERT JAMES SOLIS,                        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBIN J. HOUWMAN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                       Attorneys for plaintiff
                                           and appellee.


BEAU J. BLOUIN of
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota                  Attorneys for defendant
                                           and appellant.


* * * *

CONSIDERED ON BRIEFS
ON APRIL 29, 2019
OPINION FILED **06/26/19**

GILBERTSON, Chief Justice

[¶1.]          Robert James Solis appeals his judgment and conviction of aggravated

assault with a dangerous weapon and simple assault against his girlfriend, Lexie

Sanchez, stemming from two separate incidents.  Solis claims the circuit court

abused its discretion by joining the indictments for trial, and erred in denying his

motion for judgment of acquittal on the charge of aggravated assault.  We affirm.

## Facts and Procedural History

[¶2.]          Solis and Sanchez were in a romantic relationship and lived together

in a duplex on South Lincoln Avenue in Sioux Falls.  On April 23, 2017, police were

dispatched to the couple's address after it was reported that a person there had

called 911 and hung up.  Before the call ended, the 911 dispatcher heard a female

voice say "I got jumped" or "I got dumped."  When Sioux Falls Police Officers Jeff

Van Gerpen and Brant Van Dyke arrived at the duplex, the front door was locked

and no one answered.  Officer Van Gerpen then spoke with a neighbor who

confirmed hearing noises coming from Solis and Sanchez's apartment.  Upon

hearing this, Officer Van Dyke entered the apartment through an open window and

unlocked the front door to allow the other officers to enter.

[¶3.]          After entering the apartment through the kitchen window, Officer Van

Dyke noticed glass and pieces of a broom on the floor.  He then saw Solis walking

down the hallway of the apartment.  Solis had a cut on his forehead.  Officers Van

Gerpen and Van Dyke spoke to Solis, who claimed that he and his girlfriend had

been jumped by three men while out for a walk.  Solis did not provide any

additional information.  He also stated that his girlfriend had run off after the

incident occurred and that he did not know where she went. Sanchez subsequently called 911 from a nearby gas station and informed police that she had called 911 earlier.

[¶4.] Officer Van Gerpen was dispatched to a bank near Solis and Sanchez's apartment to speak with Sanchez. He observed that Sanchez was holding a cloth or shirt over a jagged cut on the left side of her face and that she was crying. Sanchez told Officer Van Gerpen that Solis had: struck her on the left side of her face with a broom; head butted her, causing bruising to her forehead; grabbed her cloth lanyard and pulled it across her neck to strangle her; and choked her with his hands. Sanchez also stated that Solis came up behind Sanchez and tightly wrapped his arm around her neck until Sanchez could hear a cracking noise. Sanchez reported that she struggled to breathe, made gurgling noises during this incident, and was close to passing out. She stated that during the incident, Solis stated "Shut the fuck up. Shut the fuck up. You're going to listen to me. You're not going nowhere." Sanchez told Officer Van Gerpen that after she was choked, she left the apartment to smoke a cigarette. When Sanchez returned, she saw that Solis had a cut on his forehead and that he was sweeping up glass from the floor because Solis had head butted a picture frame. Officer Van Gerpen took photos to document Sanchez's injuries.

[¶5.] Paramedic Monte Mathews tended to Sanchez's injuries shortly after the incident. He claimed that Sanchez sustained a two to three-inch laceration on the left side of her head, a one-inch laceration on the top of her head, and an egg-sized hematoma on her forehead. Paramedics transported Sanchez to the Avera

-2-

McKennan emergency department. Registered nurse Amy Clay cared for Sanchez when she arrived at the hospital. Clay stated that Sanchez had an "obvious laceration" on the side of her head, a hematoma on the right side of her head, and some redness around her neck. While in the emergency room, Sanchez said that the room was spinning and that her head hurt. Clay removed a piece of plastic from the laceration on Sanchez's face. Ultimately, Sanchez received stitches and a CT scan.

[¶6.] On July 19, 2017, police responded to another argument between Solis and Sanchez. On that day, Sanchez's mother, Calista Honomichl, and sister, Angela Roubideaux, were on their way to Solis and Sanchez's house to pick Sanchez up when they received a phone call from Sanchez. Sanchez sounded as if she needed help, so Roubideaux called 911. Around the same time, Solis and Sanchez's sixteen-year-old neighbor claimed to have heard the pair arguing, but did not call 911 because Sanchez had instructed her not to call police if she heard them.

[¶7.] When Roubideaux arrived at Solis and Sanchez's apartment, she saw Solis tugging at Sanchez's arms and shirt. Solis let Sanchez go when he saw Roubideaux. Solis called Sanchez "a crazy bitch," and said, "She's hitting me. Stop hitting me." Solis attempted to flee the duplex through a window. Roubideaux and Sanchez attempted to grab Solis and pull him back into the home, but were unsuccessful. Honomichl observed that Sanchez had red marks on her face; lumps on her cheeks, forehead, and back of her head; and bruises on her knees and elbows. Roubideaux also observed that Sanchez "had marks all over her face[.]" The pair both observed that there were holes in the walls inside the residence.

[¶8.]     Sioux Falls Police Officers Skylar Mathis and Eric Olson were dispatched to Solis and Sanchez's apartment.  The officers were told that Solis had fled the scene and were given his description.  Solis was located shortly thereafter at a nearby gas station.  When officers detained and frisked Solis, they found a blue and black knife in his right front pocket.  Officer Olson asked Solis if he had any contact with Sanchez that day, but Solis responded that "he had not seen her all day."  Solis was transported back to the duplex, and the officers continued to investigate the incident.

[¶9.]     Officer Mathis took pictures of Sanchez's injuries, which included bruises on her arms and forehead, and holes in the wall of the duplex.  Sanchez told the officers that Solis hit her with either a closed fist or open hand 30 to 40 times, kicked her, hit her on the head with a plastic bottle, pointed a knife at her, and lunged at her with the knife.  Sanchez described the knife as being blue and black.  Sanchez stated that during the incident, she attempted to leave the duplex by climbing out a window and walking out the front door, but that Solis kept pulling her back inside the residence.  Sanchez also claimed that she attempted to call 911, but Solis took her cell phone and threw it to the ground.  Sanchez said that the holes in the wall of the duplex were caused by Solis flinging her body into the wall and pushing her head into the wall.  The officers observed that one of the holes in the wall contained what appeared to be human hair.

[¶10.]     A Minnehaha grand jury indicted Solis on six counts stemming from the incident on April 23, 2017, including one count of aggravated assault by choking, one count of aggravated assault by means of a dangerous weapon, and four

alternative counts of simple assault.  A Minnehaha County grand jury also indicted Solis on eight different counts in a separate criminal file stemming from the incident on July 19, 2017.  That indictment included charges for aggravated assault by means of a dangerous weapon, aggravated assault by physical menace, three alternative counts of simple assault, interference with an emergency communication, false imprisonment, and violation of a conditional bond.  The State filed a part II information in both cases alleging Solis had five prior assault convictions which occurred in Dakota County, Iowa, and a prior felony conviction which occurred in Dakota County, Nebraska.

[¶11.]      On October 23, 2017, the State filed a motion for joinder in both cases.  It sought to join the indictments because Solis was represented by the same attorney in each case; each case involved the same victim; and the cases were "of the same or similar character[, t]he charges occurred close in time, location, and manner . . . [, and] the alleged factual scenarios of each charge [were] part of a common scheme or plan . . . [involving] the same victim."  Solis opposed the motions for joinder.

[¶12.]      The circuit court held a hearing on the motion for joinder on January 26, 2018.  After hearing oral arguments from the parties, the court entered findings of fact and conclusions of law and granted the State's motion.  The court determined that the charge against Solis for violation of a conditional bond should be tried separate from the remaining counts "to reduce any potential prejudice to [Solis] at trial."

[¶13.]     A jury trial on both indictments was held on April 9-11, 2018.  At the end of the State's case-in-chief, Solis moved for a judgment of acquittal on the charges of aggravated assault by choking and aggravated assault by means of a dangerous weapon from the April 23, 2017 incident.  Solis moved for a judgment of acquittal on the charges of aggravated assault by means of a dangerous weapon and aggravated assault by physical menace from the July 19, 2017 incident.  The court denied Solis's motions.  Solis also renewed his objection to the joinder of his indictments, which the court denied.  On April 11, 2018, the jury found Solis guilty of aggravated assault with a dangerous weapon (broom stick), and on the four counts of simple assault stemming from the incident on April 23, 2017.  The jury found Solis guilty on three counts of simple assault stemming from the incident on July 19, 2017.

[¶14.]     A sentencing hearing was held on June 26, 2018.  Solis admitted to the allegations contained in the part II informations.  The State dismissed the charge against Solis for violation of a conditional bond and two other unrelated criminal cases pending against Solis.  The circuit court sentenced Solis to 15 years in prison, with seven years suspended, for aggravated assault with a dangerous weapon (broom stick) for the April 23, 2017 incident and credit for time served.  The court also sentenced Solis to two years in prison for simple assault (recklessly causes bodily injury), for the incident on April 23, 2017.  The court suspended the sentence and ordered it to be served concurrently to the sentence for aggravated assault.  Finally, the court sentenced Solis to two years in prison for simple assault (physical menace) for the incident on July 19, 2017.  The court suspended the sentence, but

ordered it to be served consecutive to the sentences for aggravated assault and simple assault (recklessly causing bodily injury). The circuit court filed separate judgments of conviction on July 2, 2018.

[¶15.] Solis appeals his judgment of conviction and sentence, raising the following questions for our review:

1. Whether the circuit court erred in joining the cases for trial.

2. Whether there was sufficient evidence to establish Solis's guilt for aggravated assault with a dangerous weapon.

**Standard of Review**

[¶16.] "A circuit court's decision to join charges is reviewed under an abuse of discretion standard." *State v. Goodshot*, 2017 S.D. 33, ¶ 10, 897 N.W.2d 346, 349 (quoting *State v. Waugh*, 2011 S.D. 71, ¶ 11, 805 N.W.2d 480, 483). "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Waugh*, 2011 S.D. 71, ¶ 11, 805 N.W.2d at 483 (quoting *Kostel v. Schwartz*, 2008 S.D. 85, ¶ 12, 756 N.W.2d 363, 370).

[¶17.] "We review the denial of a motion for acquittal de novo." *State v. Quist*, 2018 S.D. 30, ¶ 13, 910 N.W.2d 900, 904 (quoting *State v. Traversie*, 2016 S.D. 19, ¶ 9, 877 N.W.2d 327, 330). "Our task is to determine whether the evidence was sufficient to sustain the conviction." *Id.* (quoting *State v. Guthmiller*, 2014 S.D. 7, ¶ 21, 843 N.W.2d 364, 371). "To do so, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Guthmiller*, 2014 S.D. 7, ¶ 21, 843 N.W.2d at 371). "If the evidence,

including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (quoting *State v. Martin*, 2017 S.D. 65, ¶ 6, 903 N.W.2d 749, 751).

## Analysis & Decision

> 1. *Whether the circuit court erred in joining the cases for trial.*

[¶18.] Solis argues the circuit court erred in joining the charges from his two criminal files "because the danger of unfair prejudice to Solis stemming from the impermissible character inferences created by putting two unrelated allegations of assault in front of the jury substantially outweighed any governmental interest in joining the cases." Solis claims the charges from the two incidents were inappropriate for joinder because the incidents occurred almost three months apart, involved different methods of perpetuating the alleged assaults, were not a part of the same act or transaction, and were not connected by a common plan or scheme.

[¶19.] SDCL 23A-11-1 provides that "[a] court may order two or more indictments . . . to be tried together if the offenses . . . could have been joined in a single indictment or information." SDCL 23A-6-23 sets the criteria for determining whether two offenses may be tried together, stating:

> [t]wo or more offenses may be charged in the same indictment or information in separate counts for each offense, if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Thus, SDCL 23A-6-23 provides "three separate tests which permit joinder of offenses." *State v. Dowty*, 2013 S.D. 72, ¶ 23, 838 N.W.2d 820, 828 (quoting *Waugh*, 2011 S.D. 71, ¶ 12, 805 N.W.2d at 483).

[¶20.]     Under the first test, "joinder is appropriate 'where separately charged offenses are closely related in time, location, and manner of execution.'" *Id.* ¶ 24 (quoting *State v. Loftus*, 1997 S.D. 131, ¶ 13, 573 N.W.2d 167, 171). "This test for finding joinder appropriate where the separately charged offenses are closely related in location and manner of execution has been broadly construed." *Id.* (quoting *Loftus*, 1997 S.D. 131, ¶ 12, 573 N.W.2d at 170).

[¶21.]     When joinder is proper under SDCL 23A-6-23, "the burden of proof falls to the party opposing joinder to establish sufficient prejudice to justify severance of the joined counts." "A showing of prejudice requires more than a showing of a better chance of acquittal at a separate trial." The requisite showing of prejudice is high in order "to offset the purpose of joinder, judicial efficiency."

*Goodshot*, 2017 S.D. 33, ¶ 12, 897 N.W.2d at 350 (quoting *Waugh*, 2011 S.D. 71, ¶¶ 13-14, 805 N.W.2d at 483).

[¶22.]     The circuit court held a hearing regarding the State's motion for joinder on January 26, 2018. After hearing oral arguments from the parties, the court adopted the facts of the two incidents involving Solis as recited in the State's brief in support of the motion for joinder. The court noted that the State's factual allegations were "very similar" to those contained in Solis's brief. Based on those facts, the court considered the criteria for joinder as contained in SDCL 23A-6-23. The court first found that the charges were sufficiently similar under SDCL 23A-6-23 because the two charges against Solis occurred in the same location, occurred within 87 days of each other, involved the same victim, and were caused by similar methods.

[¶23.]     The court also considered whether Solis undertook a common scheme or plan against Sanchez in both incidents.  The court determined that such a common plan or scheme existed because each incidence of violence would be admissible against Solis at trial to prove motive under SDCL 19-19-404(b).  The court cited our decisions in *State v. Phillips*, 2018 S.D. 2, 906 N.W.2d 411, for this proposition.  In *Philips*, we noted that "[p]rior instances of domestic abuse against the same victim are often relevant in the familial context because they show the nature of the relationship, which explains the interactions between the parties."  *Id.* ¶ 16, 906 N.W.2d at 415.  The court also noted our decision in *State v. Laible*, where we stated:

> Domestic abuse often has a history highly relevant to the truth-finding process.  When an accused had a close relationship with the victim, prior aggression, threats or abusive treatment of the same victim by the same perpetrator are admissible when offered on relevant issues under Rule 404(b).  The rationale for admissibility is that an accused's past conduct in a familial context tends to explain later interactions between the same persons.

1999 S.D. 58, ¶ 21, 594 N.W.2d 328, 335.  The court appeared to reason that because prior instances of domestic abuse are admissible to show motive under SDCL 19-19-404(b), those instances can also be considered as part of a common plan or scheme of domestic violence to prove joinder under SDCL 23A-6-23.

[¶24.]     Finally, the court considered the possibility of any prejudice to Solis which may have resulted from the joinder of the charges.  The court noted that "cases say that simply because two acts are being charged, that is not prejudice, there must be something more than that, and the [c]ourt finds that there has not been any demonstrable prejudice over and above what would naturally occur."

Ultimately, the court stated that it believed that each of the acts allegedly committed by Solis were "probative of the parties' relationship[,]" and indicative of a general "motive, intent and plan." Finding that no prejudice would result, the court granted the State's motion to join the two indictments.

[¶25.] The court properly considered the similar character of the two offenses committed by Solis and indicated the importance of each offense as showing part of a common scheme of Solis's domestic abuse of Sanchez under SDCL 23A-6-23. The court's findings were based on sound reasoning and supported by evidence in the record. The court did not abuse its discretion by granting the State's motion to join the indictments against Solis.

> 2. *Whether there was sufficient evidence to establish Solis's guilt for aggravated assault with a dangerous weapon.*

[¶26.] Solis next argues that the circuit court erred in denying his motion for judgment of acquittal as to the charge of aggravated assault with a dangerous weapon. Namely, Solis claims there was insufficient evidence to show that Solis used a dangerous weapon to cause bodily injury against Sanchez. He contends that the plastic broom used against Sanchez in the April 23, 2017, incident was not calculated or designed to inflict death or serious bodily harm, nor used in a manner likely to inflict death or serious bodily harm.

[¶27.] Solis was charged with aggravated assault pursuant to SDCL 22-18-1.1(2), which provides: "Any person who: . . [a]ttempts to cause, or knowingly causes, bodily injury to another with a dangerous weapon . . . is guilty of aggravated assault." SDCL 22-1-2(10) defines a "[d]angerous weapon" or "deadly weapon" as "any firearm, stun gun, knife, or device, instrument, material, or substance,

whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm[.]"

[¶28.]    Here, Solis contends, and the State concedes, that a plastic broom is not "calculated or designed to inflict death or serious bodily harm." SDCL 22-1-2(10). However, Solis also contends that the evidence did not establish that the plastic broom was used against Sanchez in a manner that was "likely to inflict death or serious bodily harm." *Id.* He first claims that there was "[n]o evidence . . . presented that Solis struck Sanchez with a broom repeatedly, maliciously[,] or more than one time[.]" He further claims that "plastic brooms are generally light and flimsy, [and] unlikely to cause serious injury, especially with one hit."

[¶29.]    There was no testimony as to the exact manner in which Solis struck Sanchez with the plastic broom. However, there was sufficient evidence to support an inference that: (1) Solis had struck Sanchez in the face with the plastic broom at least once, and (2) Solis struck Sanchez at least hard enough for the broom to break and embed a piece of plastic in Sanchez's face. According to Officer Van Gerpen, Sanchez told him that Solis had hit her in the head with the broom. Photos taken of Sanchez after the incident showed her with a piece of plastic stuck to the side of her face. Finally, Nurse Clay testified that she removed a piece of plastic from Sanchez's face after the incident. The sheer force needed to cause this type of injury to Sanchez is enough to establish that the broom was swung in a "manner . . . likely to inflict death or serious bodily harm[.]" SDCL 22-1-2(10).

[¶30.]     Solis next argues that the injuries Sanchez sustained from the incident on April 23, 2017, did not rise to the level of "serious bodily harm." Solis cites this Court's decision in *State v. Janisch*, 290 N.W.2d 473 (S.D. 1980), for this proposition. In *Janisch,* the defendant was convicted of aggravated assault after he had repeatedly struck, kicked, and thrown a victim to the floor. *Id.* at 474. The victim suffered "blue marks across his head, shoulders, and right thigh[, but] showed no real damage to his mouth, nose, or eyes, and he had no fractures or evidence of concussion." *Id.* at 474-75. On appeal of Janisch's conviction, this Court concluded that such injuries did not constitute "serious bodily injury," finding them instead to be "more closely related to the ordinary injuries sustained in any simple assault and far below the status of grave or dangerous to life, health or limb." *Id.* at 476. Solis points out that Sanchez's injuries only amounted to a laceration to the side of her face which required stitches, and red marks on her neck, which he claims cannot be considered serious bodily injury under *Janisch*.

[¶31.]     Solis' argument that the State was required to show "serious bodily injury" misapprehends the statutory elements for aggravated assault with a dangerous weapon. Further, Solis's reliance on *Janisch* is misplaced as *Janisch* involved a claim of aggravated assault under SDCL 22-18-1.1(4), which requires a showing that the assault actually resulted in "serious bodily injury" to the victim.∗

---

∗    Moreover, *Janisch* is inapposite because it was decided before the Legislature defined "serious bodily injury," and the jury in *Janisch* was not instructed on the meaning of the term. The Legislature has since defined "serious bodily injury," and juries are now instructed on its meaning. Although often quoted as authoritative by litigants, *Janisch* did not create an evidentiary standard upon which all future injuries are to be compared. In fact, since its release,

(continued . . .)

Here, Solis was convicted of aggravated assault with a dangerous weapon under SDCL 22-18-1.1(2) by the use of a plastic broom. To prove aggravated assault by means of a dangerous weapon under this subsection, the State was required to show that Solis attempted to cause *or* knowingly caused "bodily injury" with a dangerous weapon. The State was also required to show that the plastic broom was a dangerous weapon as defined in SDCL 22-1-2(10) because it was "calculated or designed to inflict death or serious bodily injury" or that "by the manner in which it [was] used [was] likely to inflict death or serious bodily injury." Proof of "serious bodily injury" to the victim is not an element of the offense of aggravated assault with a dangerous weapon under SDCL 22-18-1.1(2).

[¶32.] Here, evidence indicates that Sanchez received a two to three-inch laceration on the left side of her head, a one-inch laceration on the top of her head, an egg sized hematoma on her forehead, and some redness around her neck. A piece of plastic was embedded within the larger laceration. The plastic had to be removed, and the wound required stitches. This evidence was sufficient for a jury

_____

(. . . continued)

*Janisch* has not been substantially relied on by this Court in any subsequent aggravated assault cases. Instead, each case has been decided on its own facts to determine whether an injury "is grave and not trivial, and gives rise to apprehension of danger to life, health, or limb[]" under SDCL 22-1-2(44A). *See State v. Miland*, 2014 S.D. 98, ¶ 14, 858 N.W.2d 328, 331; *State v. Fasthorse*, 2009 S.D. 106, ¶¶ 10-11, 776 N.W.2d 233, 237; *State v. Eagle Star*, 1996 S.D. 143, ¶ 27, 558 N.W.2d 70, 76; *State v. White Mountain*, 477 N.W.2d 36, 39 (S.D. 1991); *State v. Bogenreif*, 465 N.W.2d 777, 781 (S.D. 1991); *State v. Dace*, 333 N.W.2d 812, 822-23 (S.D. 1983); *State v. Williams*, 297 N.W.2d 491, 494 (S.D. 1980); *State v. Battest*, 295 N.W.2d 739, 742 (S.D. 1980); *State v. Shear*, 295 N.W.2d 176, 178 (S.D. 1980). Therefore, *Janisch* has limited precedential value and is explicitly confined to its facts.

to conclude that Solis attempted to cause or knowingly caused bodily injury with a dangerous weapon.

## Conclusion

[¶33.] The circuit court did not abuse its discretion by granting the State's motion to join the two indictments against Solis. The court also did not err in denying Solis's motion for judgment of acquittal on the charge that Solis committed an aggravated assault by means of a dangerous weapon. We affirm.

[¶34.] KERN, JENSEN, and SALTER, Justices, and WILBUR, Retired Justice, concur.